Cliff Palefsky (SBN 77683)
Keith Ehrman (SBN 106985)
McGUINN, HILLSMAN & PALEFSKY
220 Jackson Street, Suite 350
San Francisco, California 94111
Telephone: (415) 421-9292
Facsimile: (415) 403-0202
cp@mhpsf.com
keith@mhpsf.com
*Attorneys for Plaintiff*
JAMES RICHARDS

# UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES RICHARDS,

        Plaintiff,

v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

        Defendant.

CASE NO.: 3:25-cv-3915-LB

**PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AND APPENDIX OF
EXHIBITS**
**[redacted]**

**Date:**     Thursday, May 21, 2026
**Time:**    9:30 am
**Dept:**     Courtroom B, 15th Floor

Magistrate Justice Laurel Beeler

Complaint filed May 5, 2025

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

1

2

**<u>TABLE OF CONTENTS</u>**

Page

3

I.    INTRODUCTION AND SUMMARY ...........................................................................1

4

II.   FACT BACKGROUND ..............................................................................................6

5

6

      A.    Richards' Job Duties and Scope of Authority..............................................6

7

      B.    The 2015 Wholesale Consent Order ...........................................................8

8

      C.    Richards Retires From the Bank ...............................................................12

9

10

III.  THE APA STANDARD OF REVIEW ......................................................................14

11

IV.   PLAINTIFF'S DEFERRED COMPENSATION WAS NOT A "GOLDEN
      PARACHUTE PAYMENT" ......................................................................................15

12

13

      A.    Richards' RSR Awards Were Not "Contingent on the Termination of His
            Employment" ............................................................................................16

14

15

      B.    The Federal Regulations Unlawfully Expanded the Statutory Definition of
            a "Golden Parachute" Payment..................................................................19

16

17

V.    RICHARDS WAS NOT "SUBSTANTIALLY RESPONSIBLE" FOR THE
      2015 WHOLESALE CONSENT ORDER ................................................................23

18

19

      A.    The Board's Conclusion That Richards was "Substantially Responsible"
            for the Bank's "Troubled Condition" Directly Contradicts ████████

20

            ███████████ and Ignores the Fact that Richards Had No Operational Authority

21

            Over Wholesale.........................................................................................23

22

23

      B.    The Board's Two Reasons for Finding that Richards Was "Substantially
            Responsible" for the Bank's "Troubled Condition" Are Baseless ...................25

24

      C.    The Mere Fact That Richards was the BSA Officer Does Not Make Him
            "Automatically" Liable For Wholesale's Internal Deficiencies ........................27

25

26

VI.   DISCRETIONARY FACTORS ................................................................................29

27

28

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

i

1

2

**TABLE OF CONTENTS**

Page

3    1.    The Fact That Richards Held a Position of "Managerial Responsibility"

4          at the Bank Does Not Mean that He was "At Fault" for Wholesale's

5          Documentation Problem ...................................................................................30

6    2.    The Length of Richards' Tenure and the Amount of Compensation At Issue ...31

7    3.    There Would Be No Impact on the Bank's Financial Condition........................34

8    VII.  THE BOARD VIOLATED RICHARDS' DUE PROCESS RIGHTS ..........................35

9

10   VIII. CONCLUSION................................................................................................38

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS         Case No. 3:25-cv-3915-LB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                                          <u>Page</u>

*Abdille v. Ashcroft*
    242 F.3d 477, 483 (3rd Cir. 2001) ...................................................................15

*Banccentral v. Hughbanks*
    (2023) US Dist.Lexis 16786 (W.D.Okla.) ....................................................17

*Batten v. Community Trust*
    (2019)  2019 Tenn.App.Lexis 417 ......................................................17, 18, 28

*Bauer v. FDIC*
    2023 US Dist Lexis 174720 (D.D.C. 2023).......................................... *passim*

*BBX Capital v. FDIC*
    US Dist. Lexis 222769 (S.D.Fla. 2018) .........................................................31

*Calif. Cosmetology v. Riley*
    110 F.3d 1454, 1460 (9th Cir. 1997) ..............................................................21

*Calif. School Boards v. State Board of Education*
    191 Cal.App.4th 530, 544, 119 Cal.Rptr.3d 596 (2010)................................21

*Campanelli v. Flagstar*
    2020 US Dist.Lexis 162361 (S.D.N.Y. 2020) ...............................................28

*Carmel Valley Fire Protection Dist. v. California*
    25 Cal.4th 287, 105 Cal.Rptr.2d 636, 20 P.3d 533 (2001) ...........................21

*Chevron v. NRDC*
    467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)....................22

*Defenders of Wildlife v. U.S. Dept. of Natural Resources*
    733 F.3d 1106 (11th Cir. 2013) .................................................14, 15, 27, 32

*Dickinson v. Zurko*
    527 U.S. 150, 152, 119 S.Ct. 1816, 144 L.ED.2d 143 (1999)........................15

*In re Watson*
    161 F.3d 593, 598 (9th Cir. 1998) ............................................................................19, 21

*Knyal v. OCC*
    2003 US Dist. Lexis 28513 (N.D.Cal. 2003) ...................................................................30

*Loper Bright Enters. v. Raimondo*
    603 U.S. 369, 391-392, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024)........................... *passim*

*M & T Farms v. Federal Crop Ins.*
    103 F.4th 724, 729 (9th Cir. 2024) ...........................................................................15, 26

*Manhattan General Equip. v. Commissioner*
    297 U.S. 129, 56 S.Ct. 397, 400-401, 80 L.Ed. 528 (1936) .............................................21

*Marshall County v. Shalala*
    988 F.2d 1221, 1226 (D.C. Cir. 1993).............................................................................15

*Martinez v. Rocky Mountain Bank*
    (2013) 540 Fed.Appx. 846 (10th Cir. 2013) ...............................................................18, 29

*Mathews v. Eldridge*
    424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)...........................................*passim*

*Mt. Heritage Bank v. Rogers*
    (2012) 728 S.E.2d 914, 2012 Ga.App.Lexis 551 (Ct.App.GA 2012).........................18, 29

*NL Industries v. Dept. of Transportation*
    901 F.2d 141 (D.C. Cir. 1990) ........................................................................................21

*Ocampo v. Holder*
    629 F.3d 923 (9th Cir. 2010) ..........................................................................................21

*Pratt & Whitney v. Sec'y of Labor*
    649 F.2d 96 (2d Cir. 1981)..............................................................................................21

*Pub. Employees v. Betts*
    492 U.S. 158, 171, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989)...........................................21

*Rosenberger v. United Community Bancshares*
    (2017) 73 N.E.3d 642, 2017 Ill.App.Lexis 102 (Ill.App.Ct. 2017) ................................18

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Stone v. FDIC*
    179 F.3d 1368 (Ct.App. Fed.Cir.) (1999) ....................................................................35

*WMI Liquidating Trust v. FDIC*
    110 F.Supp.3d 44 (D.D.C. 2015) ...............................................................................32

*Wisconsin Central v. United States*
    585 U.S. 274, 284, 138 S.Ct. 2067, 201 L.Ed.2d 490 (2018)....................................32

*Wohlschlager v. FDIC*
    992 F.3d 574 (6th Cir. 2021) ............................................................................ *passim*

Statutes

12 CFR
    §359.1(f)(1)    ...............................................................................................19, 20, 21

12 CFR
    §359.1(f)(1)(i) ........................................................................................................21

12 CFR
    §359.4(a) ...................................................................................................................2

12 CFR
    §359.4(a)(1) .......................................................................................................15, 22

12 CFR.
    §359.4(a)(4) ........................................................................................9, 23, 28, 29

12 CFR
    §359.4(a)(4)(i).........................................................................................................23

12 CFR
    §§359.4(a)(4)(i—iv)...............................................................................................30

12 CFR
    §359.4(a)(4)(iii) ......................................................................................................23

12 CFR
    §359.4(a)(4)(iv).......................................................................................................23

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS          Case No. 3:25-cv-3915-LB

1
2

12 CFR
    §359.4(b)(1)-(3) ................................................................................................30

3
4

5 U.S.C.
    §701 et seq. ........................................................................................................1

5
6

5 USC
    §702 ..................................................................................................................14

7
8

5 USC
    §706 ..................................................................................................................16

9
10

5 USC
    §§706(2)(B), (D) ..........................................................................................34, 35

11
12

5 U.S.C.
    §§706(2)(A), (B), (C) and (D) ......................................................................5, 15

13
14

12 USC
    §1828 ................................................................................................................17

15
16

12 USC
    §1828(k) ......................................................................................................19, 20

17
18

12 USC
    §1828(k)(2) .......................................................................................................30

19
20

12 USC
    §1828(k)(4) ........................................................................................2, 9, 15, 16

21
22

12 USC
    §1828(k)(4)(A) ..................................................................................................18

23

Treatises

24
25

Webster's New Collegiate Dictionary (1981) ...........................................................16

26

Black's Law Dictionary (6th ed. 1990) .....................................................................16

27
28

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS          Case No. 3:25-cv-3915-LB

I.    **INTRODUCTION AND SUMMARY**

This is an action for judicial review of agency action under the Administrative Procedure Act, 5 U.S.C. Section 701 et seq. ("APA"), seeking review of a decision by the Board of Governors of the Federal Reserve System ("the Board") to deny Plaintiff JAMES RICHARDS compensation that Richards had earned while he was employed by Wells Fargo Bank ("Wells Fargo" or "the Bank").  Richards worked at Wells Fargo from October 2005 until he retired in April 2018.  Richards served as Wells Fargo's Bank Secrecy Act ("BSA") Officer and was also the head of the Bank's Financial Crimes Risk Management group ("FCRM").  Throughout his 12 year tenure, Richards did an outstanding job and was widely praised by the Bank, ████████ and by the Bank's internal and external auditors.

However, the nature of Richards' job inevitably led to hostility by certain persons within the Bank because his duties included reporting misconduct and fraudulent behavior.  Indeed, Richards was a *whistleblower* at many points in his tenure, including an incident shortly before his retirement in which he ████████████████ a massive fraud which the Bank had perpetrated.  Richards was warned by both his boss ████████████ that certain persons at the Bank were upset with his whistleblowing and that he might be retaliated against by the Bank. And this is precisely what happened.  Following his retirement, the Bank took certain negative actions against Richards ████████████ to deny Richards compensation he had earned during his employment.  The Board gave "great weight" to the Bank's recommendation and denied Richards this compensation.  The Board's decision is a miscarriage of justice and should be reversed by this Court on numerous grounds—factual, legal and equitable.

The compensation at issue in this case involves equity grants called "Restricted Share Rights" ("RSRs") which were earned by Richards each year as part of his standard compensation package.  The RSRs were discretionary, i.e., the Bank decided how many RSRs to award Richards based on the quality of Richards' performance in the prior year, and they were considered "deferred compensation" because they vested over a four year period.  The RSRs were designed to incentive Richards to continue working at the Bank:  they vested as long as he remained an employee but were forfeited as soon as his employment terminated. There was one

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

1

exception: if Richards voluntarily retired, he would be entitled to continue vesting in his RSR awards.

Prior to Richards' retirement in 2018, Wells Fargo had been deemed to be in "troubled condition" by the Comptroller of Currency ("OCC") due to four Consent Orders that the OCC had issued relating to a variety of problems at the Bank.  One of the Consent Orders related to certain deficiencies in documentation within the Bank's Wholesale Banking Group ("the 2015 Wholesale Consent Order").  After a bank is deemed in "troubled condition", certain types of compensation (called "golden parachute payments") cannot be paid to employees following the termination of their employment unless the Board or the Federal Deposit Insurance Corporation ("FDIC") gives their permission.[1]  Congress restricted the payment of "golden parachutes" in order to prevent employees who had engaged in misconduct and/or who had been "substantially responsible" for a  bank's "insolvency or troubled condition" from receiving windfall payments if the bank terminated them (generally in the form of exorbitant severance payments).  Such payments would not only unfairly reward employees who had engaged in wrongdoing but would also drain assets from an already financially distressed bank.

Before the FDIC will give permission to make such a "golden parachute" payment, either the bank or the employee has to demonstrate that the employee did not engage in any of the types of misconduct set forth in 12 C.F.R. Section 359.4(a)(4)—a list that included embezzlement, fraud, bribery, falsification of documents, violation of banking laws, breach of fiduciary duty, or being "substantially responsible" for the "insolvency or troubled condition of the [bank]".   Richards had not engaged in any such misconduct.

At the time Richards retired in April 2018, he had 31,526 unvested RSRs scheduled to vest between 2019 and 2022.  Richards had earned and been awarded these RSRs between 2015

---

[1]    Pursuant to 12 USC Section 1828(k)(4), a "golden parachute payment" is defined as a payment of compensation that is "contingent on the termination of such party's affiliation with the institution" and is received on or after the date on which a federal banking agency "determines that the [bank] is in a troubled condition".  Under 12 CFR 359.4(a), "An insured…institution may agree to make…a golden parachute payment if and to the extent that": (1) "The appropriate federal banking agency, with the written concurrence of the [FDIC] determines that such payment or agreement is permissible…".

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

and 2018 based on his excellent job performance in the prior year.  Although Wells Fargo was in "troubled condition" at the time Richards retired, Richards' RSR awards *did not meet the statutory definition of a 'golden parachute' payment* (since they were not compensation that was "contingent on termination") and thus Wells Fargo was <u>not</u> required to receive "permission" from the Board before releasing these shares to Richards once they vested following his retirement.  However, the Bank erroneously concluded that Richards' RSR awards *were* "golden parachute" payments, which meant that either Richards or Wells Fargo would need to send a "certification" letter to the FDIC in order to demonstrate that Richards had not engaged in any misconduct that would disqualify him from receiving his deferred compensation.

In 2020, the Bank inexplicably told Richards that it would *not* send a certification letter on his behalf, indicating that it had reason to believe that Richards was "substantially responsible" for the 2015 Wholesale Consent Order.  This was outlandish. The Wholesale Consent Order involved Wholesale Banking's *internal* BSA/AML program and its failure to create proper documentation for customers.  The Bank was unable to give Richards or his attorneys any explanation for what Richards had supposedly done (or failed to do) that made him "substantially responsible" for the issues relating to the Wholesale Consent Order---other than the fact that Richards happened to be the BSA Officer and head of FCRM at the time of the Consent Order.

In fact, the Bank's assertion that Richards was "substantially responsible" for Wholesale's internal BSA problems



Furthermore, because of the Bank's governance structure, Richards had *no operational authority* over Wholesale's internal BSA program. None of Wholesale's BSA/AML employees reported to Richards and Richards could not force Wholesale to take actions that his FRCM

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

3

1   group recommended.  Indeed, both before and after the Consent Order, Wholesale repeatedly

2   ignored and/or rejected programs and suggestions that Richards and his FCRM group had

3   offered to Wholesale to help Wholesale fix its documentation deficiencies.  At that point,

4   Richards' responsibility was to report to his boss (the Chief Risk Officer) and to the Bank's

5   Board of Directors ("BOD") that Wholesale was failing to make adequate progress and why.

6   And Richards did exactly this both before and after the Consent Order.  Thus, it was absurd for

7   the Bank to claim that Richards was "substantially responsible" for the Bank's "troubled

8   condition".

9        The Bank's refusal to write a certification letter for Richards was clear evidence that the

10  Bank was retaliating against Richards, just as he had been warned might happen.  After being

11  pressed by Richards and his attorneys to give some justification for its refusal, and being unable

12  to identify *anything* that Richards had done wrong, the Bank told Richards that he could write

13  his own "self-certification" letter, and that the Bank *would* give Richards his deferred

14  compensation if the Board gave its approval.  Richards submitted a "self-certification"

15  application to the Board on July 20, 2021 and asked the Board for permission to receive his

16  deferred compensation.

17       On March 13, 2025—almost four years after Richards had submitted his application--the

18  Board denied Richards' request.  By this time, all of Richards' RSRs had vested.  The Board

19  first claimed that Richards' RSR awards were "golden parachute payments"—which was wrong

20  as a matter of law.  Then, relying on the Bank's "advice", the Board concluded that Richards had

21  been "substantially responsible" for the "troubled condition" of Wells Fargo, i.e., the

22  documentation issues related to the Wholesale Consent Order.  Just as the Bank had done, the

23  Board reached this determination *simply based on the fact that Richards had been the BSA*

24  *Officer and head of FCRM before and after the Consent Order*—███████████████████

25  ████████████████████████████████████████████████████████████

26  ██████████  and even though Richards had done everything reasonable within the limits of his

27  authority to assist Wholesale.

28       In its Denial Letter, the only thing that the Board could point to that Richards himself

4

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

had supposedly done "wrong" was that Richards had purportedly "undercut" Wholesale's

remediation efforts after 2015 because of "antagonism" between Richards and Wholesale

management.  The contention that Richards "undercut" or in any way "hindered" Wholesale's

remediation efforts is completely baseless and unsupported by any evidence.  The "antagonism"

between Richards and Wholesale was because Richards had repeatedly blown the whistle on

Wholesale's numerous attempts to give false and misleading reports to the BOD

regarding Wholesale's remediation efforts,

a massive fraud that Wholesale had perpetrated in early 2018, just

before Richards retired.

Under the APA, the court must reverse an agency's decision if it was "arbitrary,

capricious, an abuse of discretion or otherwise not in accordance with law", or if the agency's

action was "contrary to constitutional right", "in excess of statutory authority", or "without

observance of procedure required by law". 5 U.S.C. Sections 706(2)(A), (B), (C) and (D).  Here,

there are multiple reasons why the court should hold the Board's action unlawful and improper.

First, Richards' RSR awards simply do not fall within the statutory definition of a

"golden parachute payment", since they were *not* "contingent on the termination of Richards'

employment".  As a result, the Board had no authority to deny Richards this compensation, i.e.,

the Bank did not need the Board's "permission" to release his deferred compensation.

Second, the Board's finding that Richards was "substantially responsible" for Wholesale'

internal documentation problem is baseless and contrary to the Administrative Record—

especially since:                                                     2) Richards had

done everything reasonable *within the limits of his authority* to address Wholesale's internal

problems.  It cannot be the law that Richards is required to forfeit his earned compensation

simply because he held the title of BSA Officer—when he himself had done nothing wrong.

Third, even though Richards explained in his application letters (multiple times) that he

was being retaliated against by the Bank because of his whistleblowing—something he had been

warned about shortly before his retirement—the Board completely ignored this issue and made

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

5

no effort to investigate it.  Incredibly, the issue of possible retaliation against Richards is not mentioned *anywhere* in the Administrative Record.  As a matter of law, the fact that the Board completely ignored this issue is grounds, by itself, to reverse the Board's decision.

Fourth, the Board's action violated Richards' Fifth Amendment constitutional right to due process.  The Board deprived Richards of his property (his vested RSRs) without providing Richards a meaningful opportunity to be heard to be heard by the Board.  Instead, the Board reached its decision in secret, without ever offering Richards the opportunity to see the evidence or factors that the Board was considering; without Richards knowing what information the Bank had provided to the Board; and without offering Richards the chance to respond to the evidence and factors that the Board was considering before the Board issued its final decision.

## II.   FACT BACKGROUND

   A.   Richards' Job Duties and Scope of Authority

Richards was employed by Wells Fargo from October 2005 through April 2, 2018, when he voluntarily retired.  See, Administrative Record, p. 1, hereafter "AR:--".[2]  Richards served as Wells Fargo's Bank Secrecy Act ("BSA") Officer and the head of its Financial Crimes Risk Management ("FCRM") group.  AR:1,7; 3415; 3421—22.  The job of a BSA Officer is to design, build and oversee a BSA/AML ("Anti-Money Laundering") program for the Bank that includes policies, internal controls, customer onboarding, monitoring and training. AR:6; 3421. In addition to his role as BSA Officer, Richards was also appointed as the Global Head of FCRM, where he was given increasing responsibility and was eventually in charge of Credit Investigations; Currency Transaction Report operations; Office of Foreign Asset Control screening and reporting; the External Fraud Investigations group; the Internal Fraud and Misconduct Investigations team; and Anti-Money Laundering transaction monitoring and investigations.  AR:7.

Richards' performance was outstanding.  Every year from 2006 through 2017, the Bank's

---

[2]   All excerpts from the Administrative Record which are cited in this Motion are included in the Appendix to Plaintiff's Motion, and are listed in numerical order by their Bates Stamp number.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

1   Board of Directors ("BOD") re-appointed Richards as the Bank's BSA Officer, and every year

2   the Board ████████████ approved the BSA and FCRM programs that he oversaw.

3   AR:7; 478. The Bank consistently gave Richards good performance reviews and discretionary

4   bonuses and equity grants in light of his excellent job performance.  AR:8; 3417; 3430.

5   Richards and his programs also went through outside audits, internal audits, reviews by

6   independent consultants, ████████████████  Richards consistently received

7   excellent feedback from ████████  AR:4--8; 478—79; 3419; 3428—30; 3521—24; 3684;

8   3749.  Indeed, the Bank's Audit Department noted in its April 2017 report to the Board of

9   Directors that Richards' FCRM was an "industry leading financial crimes program". [3]  AR:7.

10          Wells Fargo's operations are conducted by five business groups, one of which is

11   Wholesale Banking ("Wholesale").  AR:6; 3418; 3421—23. As BSA Officer, Richards' job

12   included reviewing what the business groups were doing to execute the BSA/AML policies

13   which Richards had established.  AR:6,7; 3421—23.  However, because of how the Bank had

14   set up its governance structure, <u>Richards had no operational authority over the business groups</u>,

15   including no direct responsibility for (or control over) the day to day execution of the business

16   groups' BSA/AML function. AR:7—12; 3417—23; 3435; 3564—66.  The Bank had decided to

17   give each line of business significant autonomy, and as a result each business group had its own

18   *independent* Risk Management/FCRM/Compliance department--often with hundreds of

19   employees—and they did not report to Richards or his FCRM group. AR:3417—23.  Thus,

20   Richards had no power over Wholesale and could not "order" them to do anything.  AR:9—12;

21   3417—23; 3430.  Indeed, the Bank's structure made Richards' BSA/AML program a classic

22   "second line of defense": design and oversight at the second line, with the "first line of defense"

23   (the business groups) being responsible for executing the program. AR:6.  The Bank's internal

24   auditors are the "third line of defense":  they are responsible for "testing" to determine whether

25

26   [3] ████████████████████████████████████

27   ████████████████████████████████████

28   ████████████████████████████████████

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS        Case No. 3:25-cv-3915-LB

the business groups are adequately fulfilling their risk management duties.  AR:3418.

If Wholesale--or any other business group—was not doing what it needed to do in order carry out FCRM's policies, Richards' authority was limited to escalating his concerns to senior management of the business group; to his boss (the Chief Risk Officer or "CRO"); and to the Wells Fargo BOD.  AR:7,9; 3417—23.  It was not within the scope of Richards' authority or responsibility to carry out the day to day implementation of the policies within the business groups.  AR:7--11; 3417—23; 3435.  Rather, it was the job of the BSA Officer to monitor how effectively the policies and programs were implemented, to make suggestions, to urge senior management of the business group to take certain steps, and to report to the CRO and the BOD if he had concerns.  AR:7--11; 3417.

B.     The 2015 Wholesale Consent Order

In November 2015, the OCC issued a "Consent Order" to Wells Fargo because Wholesale had not prepared appropriate documentation after conducting due diligence on its customers. AR:9; 3423—26; 3592—3616. Not only were Richards and his FCRM group not at fault for this internal Wholesale documentation problem—██████████████████████████████████ ████████████ but Richards had repeatedly issued warnings to Wholesale's management and to Richards' boss and to the BOD about Wholesale's failure to adequately address the issue. AR:9—13; 3423—26.  Indeed, in the years leading up to the OCC's November 2015 Wholesale Consent Order, Richards (as the BSA Officer and head of FCRM) had expressed his alarm and concerns about Wholesale's inadequate efforts, lack of progress, and refusal to accept programs or advice that Richards and FCRM had offered to Wholesale in order to help solve the documentation problem, in eight different reports to the BOD.  AR:9—13; 479—482; 3423— 24. Richards' criticisms and warnings about Wholesale's failure to address its documentation issue led to Richards being labeled a "troublemaker" by the Wholesale group.  AR:7—12; 3423—26.

During 2015 and 2016, the OCC issued four Consent Orders to Wells Fargo on a variety of matters, including the 2015 Wholesale Consent Order.  AR:18; 3416; 3592—3616. As a result of the four Consent Orders, the OCC informed Wells Fargo in November 2016 that the Bank

8

was deemed in "troubled condition" and therefore now had to meet the requirements set forth in 12 C.F.R. Section 395.4(a) before Wells Fargo could make "golden parachute payments" to former employees.[4]  AR:2; 18; 3416.  That regulation disqualifies a former employee from receiving a "golden parachute" payment if the employee had committed certain criminal offenses (such as embezzlement, bribery, falsification of bank documents); or if the employee was guilty of fraud or a breach of fiduciary duty; or if the employee had violated banking laws; or if the employee was "substantially responsible" for the "insolvency or troubled condition" of the bank.[5]

The "disqualifying" matters listed in 12 CFR 359.4(a)(4) constitute serious offenses involving significant affirmative misconduct by the employee.  Once a bank is in "troubled condition", it cannot make a golden parachute payment until either the Bank or the employee has sent a letter to the FDIC certifying that they are not aware of any misconduct by the employee that violated 12 CFR 359.4(a)(4) and so would disqualify the employee from receiving such payment.

During the period 2014—2017, ████████████████████████████████
████████████████████████████████████████████████████████████████

---

[4]  A "golden parachute payment" was defined by Congress as a payment made to an employee that was "contingent on the termination of such party's affiliation with the institution" and that was received after the date on which the institution had been determined to be in troubled condition.  12 USC 1828(k)(4).  See, page 2, footnote 1.  As discussed below in Section IV, Richards' RSR awards were not "contingent on his termination" and so were not "golden parachute payments".

[5]  Thus, under Section 359.4(a)(4), "An [institution or individual] making a request [for payment]…shall demonstrate that it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe…that:

   (i)      The IAP has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse…likely to have a material adverse effect on the institution…;
   (ii)     The IAP is substantially responsible for the insolvency of…or the troubled condition…of the…institution…;
   (iii)    The IAP has materially violated any applicable federal or state banking law or regulation that…is likely to have a material effect on the…institution; and
   (iv)     The IAP has violated or conspired to violate [*various enumerated criminal offenses, including embezzlement, bribery, falsifying bank statements, etc.*].

9

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

1 ████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████ Wholesale's Risk Management department consisted of more than 230 full

4 time employees and managers:  <u>none of these Wholesale employees or managers reported to</u>

5 <u>Richards, and Richards had no direct or operational authority over them</u>.  AR:7—12; 3417—23;

6 3435; 3564—66.  Indeed, as described above, Wholesale had repeatedly *rejected* programs and

7 suggestions offered by Richards and FCRM that would have helped solve Wholesale's

8 documentation problem.  AR:10—12; 3423--28. ████████████████████████████

9 █████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████

13 ███████████████████████████████████████████████

14 ██████████████████████████████████████████████████████

15     After the Wholesale Consent Order was issued in November 2015 and remediation efforts

16 were required, Richards issued monthly reports to the BOD on the progress that Wholesale was

17 making.  AR:12—13; 3426—28.  Once again, *Richards had no operational authority over*

18 *Wholesale.  Id.*  Instead, his role was to <u>monitor</u> how effectively Wholesale was implementing

19 the remediation and to offer programs and suggestions to Wholesale management (which

20 Wholesale might or might not take).  AR:12—13.

21     Following the Wholesale Consent Order, Richards <u>repeatedly</u> wrote to the BOD and to his

22 boss (Mike Loughlin, the Chief Risk Officer) that FCRM's monitoring team was finding that

23 Wholesale was not doing an adequate job of remediation; that Wholesale was resisting and

24 refusing assistance and advice from FCRM; and that Wholesale was giving the Bank's BOD ███

25 ███████ <u>false, misleading, inaccurate and incomplete reports about Wholesale's purported</u>

26 <u>remediation progress</u>.  AR:12—13; 3426—28. Because Richards alerted the Bank's senior

27 management to Wholesale's dishonest reports and failure to make adequate remediation

28 progress, Wholesale again labeled Richards a 'troublemaker'.  AR: 12—13; 3428.  In fact,

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

10

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS          Case No. 3:25-cv-3915-LB

1    Richards was simply doing his job by blowing the whistle on Wholesale's failures and

2    dishonesty.

3        Prior to Richards' retirement in April 2018, neither the Bank nor the auditors *ever*

4    suggested that Richards was to blame for Wholesale's internal documentation problems relating

5    to the 2015 Wholesale Consent Order nor with Wholesale's slow remediation progress.  AR:5;

6    9—14.  In fact, following the 2015 Wholesale Consent Order,



16        In early 2018, Wholesale's antagonism toward Richards reached a whole new level.  In

17    February 2018, Richards learned that Wholesale had been involved in a *massive fraud* in which

18    Wholesale and one of its contractors were fabricating phony documents (Beneficial Ownership

19    Certificates) in an effort to complete the Consent Order remediation.  AR:13, 14; 483—84;

20    3428.  When Richards learned of this fraud in February 2018, he immediately contacted the

21    Bank's legal counsel, Corporate Investigations and Audit, and Richards insisted that the Bank

22    promptly report this fraud ███████—which Richards did.  AR:13, 14; 483—84.  Both

23    Richards's boss (Mike Loughlin, the Chief Risk Officer) and ████████████████

24    ████████ told Richards afterwards that Wholesale and certain others at the Bank were upset

25    with Richards' whistleblowing and <u>warned Richards that he might be retaliated against by the</u>

26    <u>Bank</u>.[6]  AR:13-14; 483—84; 3428.

27        [6]   Ironically, Richards and his FCRM group had designed a program specifically to help
       Wholesale create the Beneficial Ownership Certificates ("BOCs") needed for the Consent Order
28    remediation—███████████████████████████████████  AR:13—

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

### C.    Richards Retires From the Bank

Richards' annual compensation consisted of three components: a base salary, a bonus, and a discretionary award of equity based upon how well Richards had performed in the prior year. AR:8;20.  The equity was in the form of Restricted Share Rights ("RSRs")--shares of Wells Fargo stock that vested over four years and so were considered "deferred compensation".  AR:8; 190—207; 3415.  Each year, Richards earned these RSRs based upon the services he had provided to the Bank in the prior year.  AR:8; 3385--86; 3415.

The RSRs continued vesting as long as Richards remained employed by Wells Fargo, but they ceased vesting and were forfeited if Richards' employment terminated.  AR:190—207. Indeed, the RSR Agreements explicitly state upfront that RSRs are intended to be an incentive for Richards to *continue working* at Wells Fargo (AR:190—91, 199—200), since they were generally forfeited as soon as Richards' employment ended.  *Id.*  They thus served as "golden handcuffs".  There was one prominent exception: if Richards *voluntarily retired* from Wells Fargo (based on a combination of age and years of service), he would be allowed to continue vesting in his RSRs.  AR:191; 200; 3804.

At the time Richards retired from Wells Fargo on April 2, 2018, he had 31,526 outstanding RSRs that had not yet vested, representing four years of deferred compensation which Richards had earned and been awarded by the Bank between 2015 and 2018 due to his excellent performance as BSA Officer and head of FCRM.  AR:14; 28. In March 2019 and March 2020, Richards was scheduled to vest in the first two tranches of his post-retirement deferred compensation. AR:14.  However, in May 2020, Wells Fargo informed Richards that the Bank had canceled his 2019 and 2020 RSRs, and that the Bank would not send a "certification letter" to the FDIC on behalf of Richards to enable him to receive his 2021 and 2022 RSRs.  AR:475— 76.  The Bank stated that it believed the RSRs were "golden parachute" payments under the regulations.  *Id.*  The Bank also made clear that its decision related *solely* to the 2015 Wholesale

---

14; 483—84. Unfortunately, as with other programs and suggestions which FCRM had offered to Wholesale over the years, Wholesale failed to implement FCRM's program and instead wound up engaging in a massive fraud in which it simply fabricated phony BOCs. *Id.*

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

Consent Order and not to any other issues or Consent Orders.  AR:474—76. The Bank vaguely suggested that, because Richards had been the BSA Officer and head of FCRM at the time of the 2015 Wholesale Consent Order, the Bank would not send the "certification letter", <u>even though the Bank did not identify anything that Richards himself had done wrong</u>.  AR:9;15; 475—76; 3416.

Richards and his attorneys promptly contacted the Bank and said that the Bank's refusal was a gross injustice— ████████████████████████████████████████████ ██████████████████████████████████████████  AR:3, 9, 15.  Despite repeated requests by Richards and his attorneys in 2020 and 2021 that Wells Fargo identify *any* conduct by Richards that would justify the Bank depriving Richards of his deferred compensation, Wells Fargo was unable to do so.  AR:3, 15; 3417. Eventually, the Bank interviewed Richards and reviewed additional information regarding his job history. AR:15; 477--84.  The Bank still could not identify *any* conduct by Richards that warranted the Bank's refusal to send a 'certification letter'.  AR:3, 4, 15.  As a result, the Bank recommended to Richards that he send his own 'self-certification letter' to the FDIC, and told Richards that **the Bank was now willing to pay Richards his deferred compensation for 2021 and 2022 if the federal regulators approved his application**.  AR:4; 15; 167; 3417.

On July 20, 2021, Richards sent a 'self-certification' letter to the FDIC and thereby submitted his application for permission to receive his deferred compensation. AR:1—29; 3416. Richards sent a supplemental letter to the Board on September 20, 2024, providing additional information in support of his application.  AR:3415—3468.  On March 13, 2025, the Board sent Richards a letter denying his application and thus depriving Richards of the compensation he had earned in 2017 and 2018.  AR: 3817—20.[7] The Board first claimed that Richards' RSR awards (which had vested years earlier) fell within the definition of a golden parachute payment and that the Board therefore had to give its permission to the Bank before the Bank could release the RSRs to Richards.  AR:3817—18; 3800. In fact, as discussed in Section IV below, the RSR

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

[7] ████████████████████████████████████████████████ ████████████████████████████████████

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS     Case No. 3:25-cv-3915-LB

1  awards were <u>not</u> golden parachute payments and thus the entire premise of the Board's denial

2  was wrong.

3      The Board then indicated that its primary basis for denying Richards' application was the

4  *Bank's* conclusion that Richards had been "substantially responsible" for the Bank's "troubled

5  condition" related to the 2015 Wholesale Consent Order, i.e., the documentation problem within

6  Wholesale. AR:3817—18.  This was outlandish since ████████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████  The Board appeared to be adopting the Bank's position

10  that, simply because Richards was the Bank's BSA Officer and head of FCRM, he would

11  *automatically* be deemed "substantially responsible" for any internal problem within the Bank's

12  business groups—even if the Bank's governance structure meant that Richards had no

13  operational authority over Wholesale's internal BSA/FCRM department; even though Richards

14  had done everything reasonable within the limits of his authority to try to assist Wholesale; and

15  even though Richards had repeatedly informed his boss and the BOD of Wholesale's

16  deficiencies so that they could take necessary steps.

17      The Board's reasons for denying Richards' application are indefensible, as they are either

18  unsupported by the factual record, contrary to the factual record, or incorrect as a matter of law.

19  **III.  <u>THE APA STANDARD OF REVIEW</u>**

20      Pursuant to 5 USC Section 702, "a person suffering legal wrong because of agency action,

21  or adversely affected or aggrieved by agency action…is entitled to judicial review thereof."

22  When a court reviews an agency's decision under the APA, the court will give "deference" to an

23  agency's decision with respect to its factual findings (*Defenders of Wildlife v. U.S. Dept. of*

24  *Natural Resources,* 733 F.3d 1106 (11th Cir. 2013)) and will start with a presumption that the

25  agency's action is valid. *Environmental Defense Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir.

26  1981).  But the APA mandates that the court must reverse the agency's decision if it is,

27  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; or if the

28  agency action is "contrary to constitutional right"; or if it is "in excess of statutory authority"; or

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

14

1   if was taken "without observance of procedure required by law".  5 USC Sections 706(2)(A),

2   (B), (C), (D); *Dickinson v. Zurko*, 527 U.S. 150, 152, 119 S.Ct. 1816, 144 L.ED.2d 143 (1999).

3       When an agency action is challenged, the court considers the administrative record and the

4   entire case on review is a question of law. *Marshall County v. Shalala*, 988 F.2d 1221, 1226

5   (D.C. Cir. 1993).  The court must review the evidentiary basis for an agency's action and will

6   not uphold the decision if the evidence compels a contrary conclusion.  *Abdille v. Ashcroft*, 242

7   F.3d 477, 483 (3rd Cir. 2001).  An agency's action will be deemed arbitrary and capricious where

8   the agency: 1) has relied on factors which Congress had not intended it to consider; or 2) entirely

9   failed to consider an important aspect of the problem; or 3) offered an explanation for its

10  decision that runs counter to the evidence before the agency; or 4) is so implausible that it could

11  not be ascribed to a difference in view or the product of agency expertise.  *M & T Farms v.*

12  *Federal Crop Ins.*, 103 F.4th 724, 729 (9th Cir. 2024); *Defenders of Wildlife v. U.S. Dept. of*

13  *Natural Resources*, 733 F.3d 1106, 1115 (11th Cir. 2013).

14  **IV.   PLAINTIFF'S DEFERRED COMPENSATION WAS NOT A "GOLDEN**

15      **PARACHUTE PAYMENT"**

16      With respect to Richards' 2017 and 2018 RSR awards, both the Bank and the Board

17  believed that these awards qualified as "golden parachute payments" and that the Bank therefore

18  needed permission from the federal regulators before it could pay Richards his compensation.

19  The Board stated that the RSR awards met the definition of a "golden parachute payment"

20  because payment of the RSRs was "*contingent on, or by its terms payable on or after*" Richards'

21  termination of employment, quoting 12 CFR 359.4(a)(1).  AR:3817--18.

22      The Board's determination that Richards' deferred compensation was a golden parachute

23  payment was not in accordance with the law as set forth by Congress in 12 U.S.C. 1828(k)(4).

24  As a result, the Bank was **not** required to obtain "permission" from the Board before it could pay

25  Richards his deferred compensation.  First, Richards' RSR awards were *not* "contingent on the

26  termination of Plaintiff's employment" but instead were usually <u>forfeited</u> upon termination.

27  AR:190—91; 199—200.  Second, although Richards' 2017 and 2018 RSR awards vested and

28  were payable "after" the date of his April 2018 retirement, the FDIC regulations impermissibly

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

15

expanded the statutory definition of "golden parachute" to include *any* payment that was made "on or after" an employee's termination—an unlawful amendment of Congress' statutory definition that renders the regulation invalid.

A.     <u>Richards' RSR Awards Were Not "Contingent on the Termination of His Employment"</u>

In 12 U.S.C. Section 1828(k)(4), Congress defined a "golden parachute payment" as "any payment…in the nature of compensation…that (i) **is contingent on the termination of such party's affiliation with the institution**…and (ii) is received on or after the date on which…the institution's…federal banking agency determines that the…institution is in a troubled condition".[8]  The APA makes clear that the reviewing court has the responsibility to decide all questions of law, including how statutory provisions should be interpreted.  5 USC Section 706 ("To the extent necessary to decision…the reviewing court shall decide all relevant questions of law [and], interpret constitutional and statutory provisions…").

The phrase "golden parachute payment" has historically referred to a special large payment which will be provided to an employee (especially executives) *only if* the employee is terminated in the future under certain circumstances.  Thus, the payment is "contingent" on the employee's termination.[9]  The classic example of a "golden parachute" is where a company believes it may be the subject of a merger, acquisition or bankruptcy which might result in the termination of its executives.  See, *Bauer v. FDIC*, 2023 US Dist Lexis 174720 (D.D.C. 2023); *Wohlschlager v. FDIC,* 992 F.3d 574 (6th Cir. 2021).   In that situation, in order to provide some "protection" for the executives, the employer creates an agreement which will provide a large severance or special bonus payment to the executive *only if* the executive is terminated.  Such a payment is

---

[8]   Congress excluded certain types of payments from being deemed 'golden parachutes' even though they were clearly 'contingent' on termination, such as payments made pursuant to a retirement plan or payments made due to the death of the employee (since such payments are obviously dependent on, and can *only* become due upon, the cessation of employment).  *Id.*

[9]   The term "contingent" is defined as "dependent on or conditioned by something else" (Webster's New Collegiate Dictionary (1981)) or as "conditioned upon the occurrence of some future event which is itself uncertain or questionable" (Black's Law Dictionary (6th ed. 1990)).  Thus, a payment that is "contingent on termination" is a payment that is dependent or conditioned on the occurrence of the termination.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

not part of the employee's normal compensation and has not been earned for services the employee had actually rendered.  Instead, it was a special post-employment payment made *in addition to* an employee's previously earned compensation.

Congress's purpose for enacting the "golden parachute" restrictions of 12 USC Section 1828 was clear:  Congress wanted to ensure that executives who had engaged in misconduct and were significantly involved in creating a bank's troubled financial condition were not making agreements with the bank to receive special 'windfall' payments if their employment was terminated, especially since this would further drain the bank's assets.[10]

Not surprisingly, almost every case in which a bank's "golden parachute" situation has arisen under 12 USC Section 1828(k) is in the context of a contractually agreed upon "severance payment" which an executive is to receive from the bank if he or she is terminated in the future.  Sometimes, the severance payment is for two or three times the amount of the executive's salary.  See, e.g., See, e.g., *Wohlschlager v. FDIC,* 992 F.3d 574 (6th Cir. 2021) (executive who had been employed for only three years prior to his termination had a contract providing for two years salary as severance if he was terminated).  This is exactly the situation contemplated by

---

[10]  See, See, *Bauer v. FDIC*, 2023 US Dist Lexis 174720 (D.D.C. 2023) ("golden parachute" payments typically consist of "windfall" payments contractually promised to an institution's high ranking employees if they are fired, the company becomes bankrupt, or the company is acquired; Congress authorized the FDIC to restrict the circumstances under which an institution that has fallen into financial disrepair can honor a golden parachute payment; making good on those promised payments may put more financial stress on an already struggling institution and unjustly reward those who contributed to the institution's financial woes); *Banccentral v. Hughbanks* (2023) US Dist.Lexis 16786 (W.D.Okla.) (the term 'golden parachute' generally refers to an employment agreement between a business and an executive stipulating that the business will compensate the executive at a predetermined amount should the executive be terminated; in certain circumstances, the FDIC regulates these payments to protect the soundness of financially troubled institutions); *Wohlschlager v. FDIC,* 992 F.3d 574 (6th Cir. 2021) (when companies hire executives, they sometimes promise to pay them a windfall if they are fired, the company becomes bankrupt, or the company is acquired; to guard against excessive golden parachute payments by struggling financial institutions, Congress directed that the FDIC should withhold such payments that are "contingent on the employee's termination" if the employee committed fraud, violated banking or finance laws, or was substantially responsible for the institution's troubles); *Batten v. Community Trust* (2019)  2019 Tenn.App.Lexis 417 (purpose of the golden parachute regulations is to prevent executives who have been terminated from troubled depository institutions from draining money from those institutions).

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

17

Congress---an exorbitant "windfall" payment which will be paid to the executive *only* if the executive is terminated, but under circumstances where the executive engaged in affirmative misconduct or was found to be personally responsible for substantially contributing to the bank's troubled condition.  Under these circumstances, the courts have repeatedly found that such payments are "golden parachutes" and the bank may not make such payments unless approval is given by the federal regulators.[11]

Under 12 U.S.C. Section 1828(k)(4)(A), a "golden parachute payment" is defined as a payment that is "*contingent on the termination of such party's affiliation with the institution*." But Richards' receipt of his deferred compensation—the RSRs at issue here—was **not** contingent on his termination.  To the contrary, Richards' RSRs vested *so long as he remained employed by Wells Fargo.* AR:190—91; 199—200. This is the *opposite* of a payment that is "contingent on termination".  Indeed, the RSR Agreements expressly state that the RSRs are intended to encourage Richards to *continue working* at Wells Fargo (AR:190; 199), since the RSRs generally cease vesting and are *forfeited* if Richards' employment is terminated by the Bank.  AR:190—91; 199—200. The RSRs were thus actually designed to be "golden handcuffs", not a "golden parachute".[12]

Under these circumstances, Richards' RSRs simply do not fall within the Congressional

---

[11]  See, e.g.  *Batten v. Community Trust* (2019)  2019 Tenn.App.Lexis 417 (plaintiff was CEO and President of Bank and had been terminated for cause; plaintiff trying to collect contractual severance payments); *Rosenberger v. United Community Bancshares* (2017) 73 N.E.3d 642, 2017 Ill.App.Lexis 102 (Ill.App.Ct. 2017) (plaintiff was Chief Lending Officer; bank terminated plaintiff for cause; severance pay at issue); *Martinez v. Rocky Mountain Bank* (2013) 540 Fed.Appx. 846 (10th Cir. 2013) (plaintiff was President and Regional VP of bank and was terminated by bank; severance payments at issue); *Mt. Heritage Bank v. Rogers* (2012) 728 S.E.2d 914, 2012 Ga.App.Lexis 551 (Ct.App.GA 2012) (plaintiff was Senior Vice President and was terminated by bank; severance pay at issue); *Bauer v. FDIC*, 2023 US Dist Lexis 174720 (D.D.C. 2023) (plaintiffs were two senior executives who had been terminated by bank; severance pay at issue).

[12]  If Richards had not voluntarily retired from the Bank in April 2018 but instead had simply continued as an employee until 2022, Richards would have continued vesting in his deferred compensation and the RSRs at issue here (the ones granted to him in 2017 and 2018) would have been indisputably payable to Richards in 2021 and 2022 while he was an employee.  AR:190—98; 199—207.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

18

definition (or intent) of a payment which is "contingent on the termination of [his] employment". The fact that the RSR Agreements had an "exception", pursuant to which Richards was *also* entitled to continue vesting in his RSRs if he "voluntarily retired" from the Bank (AR:191; 200) does not transform his deferred compensation into something that is "contingent" on his termination.

Furthermore, Congress' intent in creating this legislation was to prevent "windfalls" for executives who had engaged in misconduct, especially with respect to exorbitant severance pay arrangements. Richards' RSRs were not a "windfall", nor were they some form of severance pay. *They were a basic part of Richards' annual compensation, and were awarded by the Bank based entirely upon the quality of Richards' job performance in the <u>prior year</u>.* AR:208—12; 217—21. The RSRs were thus deferred compensation that had been <u>earned</u> by Richards based on services he had already provided—they were not some special "future" windfall compensation that would only be paid if Richards was terminated. Richards' earned compensation is thus not within the contemplation of the "golden parachute" provisions. See, *Bauer v. FDIC*, 2023 US Dist Lexis 174720 (D.D.C. 2023) (earned compensation, for actual bona fide employment services, is not subject to the golden parachute restrictions because it is not contingent on termination; payments for services actually rendered should not be deemed golden parachutes).

Richards' RSRs were never intended to fall, and do not fall, within the statutory definition of a "golden parachute payment" created by Congress in 12 U.S.C. 1828(k).

B.    <u>The Federal Regulations Unlawfully Expanded the Statutory Definition of a "Golden Parachute" Payment.</u>

As an alternative to the "contingent on termination" language, the Board's Denial Letter stated that Richards' RSR awards were also 'golden parachute' payments because they were "*payable on or after the termination of his employment*" (AR:3817—18), citing the definition in 12 C.F.R. 359.1(f)(1)—a definition that had <u>grossly expanded</u> Congress' statutory definition of 'golden parachute'. Under the APA, the Board's action was "not in accordance with law" because the regulation upon which the Board relied (12 CFR 359.1(f)(1)) is invalid: the FDIC

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS    Case No. 3:25-cv-3915-LB

unlawfully changed the statutory definition of a "golden parachute payment" in a manner which improperly altered and amended the statute. **A federal regulation that does so is invalid.** *In re Watson*, 161 F.3d 593, 598 (9th Cir. 1998).

The definition of "golden parachute" was included by Congress as part of the Omnibus Crime Control Act which was passed in November 1990 (Public Law 101-647).  Congress had considered several possible definitions, but the 1990 law limited the definition of a "golden parachute payment" to a payment that was "**contingent on termination of employment**".  12 U.S.C. 1828(k)(4).  However, when the FDIC subsequently proposed rules for this statute in 1995 and then adopted regulations in 1996, the FDIC vastly (and impermissibly) broadened the definition of "golden parachute payment" to include *any* payment that "**by its terms was payable on or after**" an employee's termination. 12 C.F.R. Section 359.1(f)(1).

Significantly, in the leadup to the passage of the Omnibus Crime Control Act, Congress considered several different versions of the bill:  some included the more restrictive definition of "golden parachute" ("contingent on termination") and some included the "expanded" version ("contingent on termination" or "payable on or after termination").[13]  Ultimately, S. 3266 was introduced in late October 1990 with the more restrictive definition after months of combining, consolidating, and reconciling various pieces of proposed legislation.  Congress passed the version with the more restrictive definition in November 1990.

Thus, it is clear from the legislative record that two different definitions of "golden parachute payment" were offered to, and considered by, Congress. Congress could have adopted the more expansive definition but it specifically chose the more restrictive one.  In 1996—six years after Congress had passed the Crime Control Act--the FDIC adopted regulations which re-wrote the Congressional definition of "golden parachute payment" by expanding the definition

---

[13]  Compare, e.g., H.R. 5401 (the "Banking Law Enforcement Act of 1990", introduced in the House of Representatives in July 1990 and having only the restricted definition) with the version of the same bill that was introduced to the Senate in mid-October 1990 (amended to contain the broader definition of 'golden parachute').  See also, S. 3194 (another iteration of the "golden parachute" legislation known as the "Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990", introduced in mid-October 1990 and containing the broader definition) and H.R. 5269 (a House version of what became the Crime Control Act that went through dozens of amendments between July and October 1990 and contained the more restrictive definition of 'golden parachute').

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

20

1    in precisely the way which Congress had previously considered and rejected.[14]

2    The FDIC's attempt to expand and alter the definition and scope of a 'golden parachute

3    payment' in a manner that is inconsistent with Congress' definition is impermissible and invalid.

4    An agency does not have the power or discretion to promulgate regulations that are inconsistent

5    with the governing statute, or which alter or amend the statute, or which enlarge its scope, or

6    which add to the statute something that is not there.[15]

7    A federal regulation that conflicts with (or is inconsistent with) a federal statute is invalid

8    as a matter of law.  *In re Watson*, 161 F.3d 593, 598 (9th Cir. 1998); *Pub. Employees v. Betts,*

9    492 U.S. 158, 171, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989); *Loper Bright Enters. v. Raimondo*,

10   603 U.S. 369, 391-392, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) (hereafter "*Loper*") (courts

11   have the responsibility to interpret statutory provisions, and the APA requires courts to hold

12   unlawful and set aside agency action which they find are not in accordance with law).  Any

13   inconsistency between the language of a statute and the language of a regulation must be

14   resolved in favor of the statute, and the court must set aside any agency action that is

15   inconsistent with the law as interpreted by the court.  *Loper, supra,* 603 U.S. 369; *Calif. School*

16   *Boards v. State Board of Education*, 191 Cal.App.4th 530, 544, 119 Cal.Rptr.3d 596 (2010)

17   (agency does not have discretion to promulgate regulations that are inconsistent with the

18   governing statute, alter or amend the statute, or enlarge its scope).

---

19   [14]  The FDIC proposed the broader "or by its terms is payable on or after" language as part of
20   its regulatory process in 1995.  See, 60 F.R. 16069 (Mar. 29, 1995).  This "new" definition was
     subsequently adopted by the FDIC for 12 CFR 359.1(f)(1)(i) in its Final Rule.  See 61 F.R. 5926
     (Feb. 15, 1996).

21   [15]  See, *Calif. Cosmetology v. Riley*, 110 F.3d 1454, 1460 (9th Cir. 1997) (a regulation may not
22   serve to amend a statute, nor add to the statute something which is not there); *Ocampo v. Holder*,
     629 F.3d 923 (9th Cir. 2010) (same); *Manhattan General Equip. v. Commissioner*, 297 U.S. 129,
23   56 S.Ct. 397, 400-401, 80 L.Ed. 528 (1936) (a regulation which is not consistent with a statute is
     not valid; regulation must carry into effect the will of Congress and a regulation which does not
24   do this is a nullity); *NL Industries v. Dept. of Transportation*, 901 F.2d 141 (D.C. Cir. 1990)
25   (agency may not adopt or apply a regulation in a manner that enlarges its scope beyond that of the
     statute); *Pratt & Whitney v. Sec'y of Labor*, 649 F.2d 96 (2d Cir. 1981) (agency may not enact
26   regulations that go beyond scope of the statute); *Carmel Valley Fire Protection Dist. v.*
     *California*, 25 Cal.4th 287, 105 Cal.Rptr.2d 636, 20 P.3d 533 (2001) (government agencies may
27   not promulgate a regulation which is inconsistent with the governing statute; regulations that alter
     or amend the statute or enlarge or impair its scope are void).

28

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

21

Notwithstanding that agencies are empowered to enact regulations, it is always the job of the *courts* to interpret a statute, and <u>no deference</u> will be given to agency interpretations of statutes. *Loper, supra,* 603 U.S. 369 at 385-388, 391-392, 398-399, 412-413. In *Loper,* the Supreme Court overruled *Chevron v. NRDC* (1984) 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 ("*Chevron*"), and unequivocally and emphatically rejected the notion that the courts should give any deference to an agency's interpretation of a statute when the agency is adopting regulations. *Loper, supra,* 603 U.S. 369 at 412-413. To the contrary, under the APA, courts must exercise independent judgment in determining the meaning of statutory provisions and it is the responsibility of the courts—and the courts alone--to decide whether an agency's "interpretation" of the law is valid. *Loper*, *supra*, 603 U.S. 369 at 391-394. Statutes have a single, best meaning and every statute's meaning is fixed *at the time of enactment. Loper, supra,* 603 U.S. 369 at 399-400 (citing *Wisconsin Central v. United States*, 585 U.S. 274, 284, 138 S.Ct. 2067, 201 L.Ed.2d 490 (2018)).[16]

Thus, even though the FDIC has the authority to adopt regulations under the statute, it does not have the power to interpret the statutory definition of "golden parachute payment" however it wants or alter or expand its scope or meaning. Congress definitively and clearly spoke to the issue of what constituted a "golden parachute" payment--and during its drafting of the statute, Congress specifically considered and rejected the more expansive definition now proposed by the FDIC.

Because the FDIC's regulation at 12 CFR Section 359.4(a)(1) defining "golden parachute payment" improperly altered and expanded the statutory definition to include any payment made

---

[16] Under *Chevron,* the courts would generally give "deference" to an agency's interpretation of a statute if the statute was ambiguous or was silent on the issue at hand, or if Congress' intent was not clear. *Loper, supra,* 603 U.S. 369 at 379-380, 396-397. Even under *Chevron's* now overruled two step approach, the FDIC's 1996 expansion of the statutory definition of 'golden parachute' would have been rejected as invalid because Congress had spoken directly on the precise issue here—the definition of a 'golden parachute payment'--and Congress's intent was clear since it had rejected the "broader" definition later adopted by the FDIC. Even *Chevron* mandated that, if the intent of Congress was clear, courts were required to reject administrative constructions which were contrary to clear congressional intent. *Loper, supra*, 603 U.S. 369 at 396-397, 379-380.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

22

1   "on or after termination of employment", that regulation is invalid.  The Board relied on that

2   regulation as a basis for denying Richards his compensation, and in doing so the Board failed to

3   act in accordance with law and made a determination that was arbitrary, capricious and an abuse

4   of discretion.

5   **V.    RICHARDS WAS NOT "SUBSTANTIALLY RESPONSIBLE" FOR THE**

6   **2015 WHOLESALE CONSENT ORDER**

7        As described above at pages 8 and 9, an employee who is seeking to receive permission to

8   receive a "golden parachute payment" needs to establish to the federal regulators that he or she

9   did not engage in any of the enumerated types of misconduct set forth in 12 CFR 359.4(a)(4).

10  Once this is shown, the regulators can authorize the bank to pay the compensation to the

11  employee. The offenses listed in Section 359.4(a)(4) as grounds for denying certification (fraud,

12  embezzlement, falsification of documents, bribery, breach of fiduciary duty, violations of

13  banking laws, etc.) involve serious *affirmative misconduct* by the employee.  When Section

14  359.4(a)(4)(ii) states that another ground for denying certification is when an employee was

15  "substantially responsible for the insolvency of…or troubled condition of the institution", this

16  has to implicate some sort of <u>serious wrongdoing.</u>

17       Neither the Bank nor the Board has ever suggested that Richards committed any of the

18  "offenses" listed in Sections 359.4(a)(4)(i), (iii) or (iv).  The only "disqualifying" factor the

19  Board is using here is 359.4(a)(4)(ii), i.e., that Richards was "substantially responsible" for the

20  "troubled condition" of the Bank.  AR:3817—18.  And, both the Bank ███████████ have

21  pointed to the 2015 Wholesale Consent Order (involving Wholesale's lack of proper

22  documentation) as the sole matter for which Richards was allegedly "substantially responsible".

23  AR:474—76; 3800—03; 3809; 3817—18.

24       A.    <u>The Board's Conclusion That Richards was "Substantially Responsible" for the</u>

25            <u>Bank's "Troubled Condition" Directly Contradicts</u> ███████████ <u>and Ignores</u>

26            <u>the Fact that Richards Had No Operational Authority Over Wholesale</u>

27       The Board's conclusion that Richards should be deemed "substantially responsible" for

28  Wholesale's internal documentation problem ***directly contradicts*** ███████████

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

23



Furthermore, as discussed above, because of the Bank's governance structure, even though Richards was the Bank's BSA Officer and head of FCRM, Richards had *no operational authority* over Wholesale's internal BSA program; none of Wholesale's BSA/AML employees reported to Richards; and Wholesale repeatedly ignored and/or rejected programs and advice that Richards and his FCRM group had offered to Wholesale to help with the documentation deficiencies. At that point, Richards' only recourse was to report to the CRO and to the BOD that he believed that Wholesale was failing to make adequate progress and why. And Richards repeatedly did this both before and after the 2015 Wholesale Consent Order.[18]

---

17 ████████████████████████████████████████████████

████████████████████████████

---

18 In fact, because the Bank had created a governance structure such that Richards and FCRM had almost no control over (or involvement with) Wholesale's day to day BSA/AML operations (or the operations of the other Lines of Business), ████████████████████████████████

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

1    Under the APA, if a Board's finding "runs counter to the evidence", then the Board's

2    determination will be deemed arbitrary, capricious and an abuse of discretion.  See, page 14,

3    *supra*.   Here, the Board's finding that Richards was "substantially responsible" for Wholesale's

4    internal documentation problem is outlandish and clearly "runs counter to the evidence".

5         B.    The Board's Two Reasons for Finding that Richards Was "Substantially

6              Responsible" for the Bank's "Troubled Condition" Are Baseless

7    In its Denial Letter, the Board gave two reasons why it had reached the conclusion that

8    Richards was substantially responsible for the Bank's troubled condition as it related to the 2015

9    Wholesale Consent Order.  AR:3801; 3809.  Neither of these explanations is defensible.

10   The Board's Denial Letter says that, according to the Bank, Richards "undercut"

11   Wholesale's remediation efforts after the 2015 Consent Order.  ██████████████████████

12   ████████████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████

15   This is a complete misstatement of the facts since it suggests that *Richards* was somehow

16   at fault for creating "antagonism" with Wholesale leadership, and that as a result of this

17   antagonism, Richards "undercut" or otherwise "prevented" Wholesale from doing effective

18   ████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████  The prior governance structure and reporting lines had
     been determined by the Bank, not by Richards.

26   [19]  In fact, this is the only instance in the Administrative Record where either ████████ or the
     Bank try to point to anything that Richards *himself* personally did (or failed to do) that they claim
27   justifies finding that Richards was "substantially responsible" for the "troubled condition" of
     Wells Fargo.

28

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

25

1  remediation work.  <u>In fact, Richards did absolutely nothing to "undercut" or interfere with

2  Wholesale's remediation efforts</u>.  The record is clear that the "antagonism and clashes" referred

3  to by the Board were the result of Richards having objected each time Wholesale attempted to

4  *mislead and/or lie to the Bank's Board of Directors* ███████ about the remediation

5  progress that Wholesale was supposedly making; or where Richards reported that Wholesale had

6  rejected FCRM's offers of assistance; or where Richards properly informed the BOD that

7  Wholesale was not making adequate progress on the documentation issue; or where Richards

8  informed the Bank ██████ in February 2018 that Wholesale had engaged in a massive

9  fraud by fabricating phony BOC documents.  AR:9—14; 3423—28.

10    There were certainly "clashes and antagonism" between Richards and Wholesale, but this

11  was simply because Wholesale's leaders were upset that Richards had repeatedly "blown the

12  whistle" on them and they therefore labeled Richards a "troublemaker".  AR:9—14; 3423—28.

13  Indeed, both Richards' boss (Mr. Loughlin) and ███████████████

14  expressed concern to Richards shortly before his retirement that he might suffer retaliation from

15  the Bank because of Richards' efforts to rightfully call out Wholesale for its false, misleading

16  and  fraudulent conduct. AR:13—14; 483—84; 3428.

17    Significantly, <u>there is absolutely no evidence in the Administrative Record that Richards

18  ever "refused" to help Wholesale, or that he "prevented" Wholesale from carrying out

19  remediation efforts, or that he otherwise "undercut" its remediation efforts</u>.  The complaints

20  which Wholesale apparently made about Richards ('Wholesale was unhappy because it believed

21  that Richards was telling his concerns ███████; 'the relationship between Richards and

22  Wholesale's BSA/AML Group Risk Officer was strained'; 'Wholesale said that it distrusts

23  Richards'; 'Richards was pointing the finger at others and blaming others') were because

24  Richards had diligently and properly carried out his responsibilities as the BSA Officer and head

25  of FCRM by reporting Wholesale's wrongdoing.  AR:381—82; 485--87; 3810.  None of these

26  comments supports the notion that Richards 'hindered' Wholesale from doing its remediation

27  work.  Indeed, as discussed  above, ████████████████████████

28  ██████████████.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

As noted previously, an agency's action will be deemed arbitrary and capricious where the agency has offered an explanation for its decision that "runs counter to the evidence" before the agency. See, *M & T Farms v. Federal Crop Ins.,* 103 F.4th 724, 729 (9th Cir. 2024); *Defenders of Wildlife v. US Dept. of Natural Resources*, 733 F.3d 1106, 1115(11th Cir. 2013). Here, there is <u>no evidentiary support whatsoever</u> for the Board's assertion that Richards "undercut" Wholesale's remediation efforts or that he somehow "prevented" Wholesale from doing effective remediation. It would be outrageous to deny Richards his earned compensation simply because Richards had properly fulfilled his duties as the head of FCRM.

C.  <u>The Mere Fact That Richards was the BSA Officer Does Not Make Him "Automatically" Liable For Wholesale's Internal Deficiencies</u>

Once we remove the patently false claim that Richards "undercut" Wholesale's remediation efforts because of his "clashes" with Wholesale, the Board's only remaining rationale for finding that Richards was "substantially responsible" for the Wholesale Consent Order is simply because Richards was the head of FCRM at the time the Consent Order was issued. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ In other words, the Board is asserting that, <u>simply by virtue of the fact that Richards was the head of FCRM,</u> Richards is "automatically" to blame for any problems that existed in the Wholesale Bank's *internal* BSA program and so Richards should be held "substantially responsible" for the Wholesale Consent Order. This is outlandish, especially when the Administrative Record clearly shows that: 1) Richards did everything reasonable <u>within the limits of his authority</u> to help address Wholesale's internal documentation problem and alert his superiors to the problem, and 2) ████████████████████ ████████████

The notion that Richards can be found "substantially responsible" for Wholesale's internal documentation problems *solely* based on the fact that Richards was the Bank's BSA Officer at the time a Consent Order was issued is absurd, arbitrary and capricious. For example, what if

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

27

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS    Case No. 3:25-cv-3915-LB

Richards learned that certain Wholesale employees were embezzling money and Richards promptly reported this to the head of Wholesale's BSA program and to Richards' boss (the Chief Risk Officer) and to the BOD, and urged them to take corrective action---since Richards himself did not have any operational authority over Wholesale employees? If the head of Wholesale and Richards' boss and the BOD thereafter failed and refused to take any action to stop the embezzlement and so the embezzlement within Wholesale continued, *despite Richards' reporting the problem and urging them to put a stop to it*, would Richards be found "substantially responsible" for the embezzlement within Wholesale? Of course not---he tried to do everything *within the limits of his authority* to stop the embezzlement.

The fact that Richards was the BSA Officer at the time a Consent Order was issued cannot be, by itself, a legal basis to deny him his earned compensation unless he actually did something wrong.[20] Indeed, given the list of serious offenses in Section 359.4(a)(4) (embezzlement, bribery, fraud, falsification of bank documents, breach of fiduciary duty) that justify denying a golden parachute payment, it makes no sense to say that an employee who did nothing affirmatively wrong will nevertheless be punished simply because he or she held a high level position. The standard under Section 359.4(a)(4) is not whether Richards happened to be the BSA Officer at the time a Consent Order was issued---the standard is whether Richards *himself* was "substantially responsible" for the "insolvency or troubled condition" of the Bank.

Indeed, the caselaw involving golden parachute payments is clear: when someone has been found "substantially responsible" for the troubled condition of a bank, the courts have always found some degree of personal wrongdoing or personal involvement that directly and significantly contributed to the bank's problems.[21]

---

[20] See, *Campanelli v. Flagstar* (2020) 2020 US Dist.Lexis 162361 (S.D.N.Y. 2020) (plaintiff was President and CEO of Bank; Bank had been issued a Consent Order during plaintiff's tenure; Bank said that because of the Consent Order, it was justified in refusing to make the certification; court rejected Bank's motion to dismiss plaintiff's because the fact that the Bank was required to enter into a Consent Order does not alone establish, as a matter of law, plaintiff's responsibility for the Bank's troubled condition.)

[21] See, *Batten v. Community Trust* (2019) 2019 Tenn.App.Lexis 417 (plaintiff, who was CEO and President of bank, was terminated for cause; Bank refused to make "certification" because plaintiff was guilty of personal dishonesty, incompetence, willful misconduct, breach of fiduciary duty involving personal profit, willful failure to perform stated duties and willful

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

1    Instead of relying on its interviews 

2

3

4

5                                    [22] AR:3805.   As a matter of the Bank's "corporate

6    structure", this is technically correct.  But as discussed above, Richards had <u>no operational</u>

7    <u>authority or control over Wholesale's internal BSA/AML program</u>, and none of Wholesale's

8    BSA/AML employees reported to him.  Nor could Richards "order" Wholesale to do anything,

9    meaning that Wholesale was free to ignore or refuse FCRM's advice and programs.

10        In sum, there is no basis in the Administrative Record to find that Richards was

11   "substantially responsible" for the "troubled condition" of Wells Fargo, and the mere fact that he

12   was the BSA Officer at the time of the Consent Order is not an adequate basis under 12 CFR

13   Sec. 359.4(a)(4) to find that he should be "disqualified" from receiving his earned compensation.

14   **VI.    DISCRETIONARY FACTORS**

15        If the Court agrees with Plaintiff that Richards was not "substantially responsible"

16

17   violation of laws and regulations which materially and negatively affected the bank; plaintiff had
     also incentivized the extension of excessive loans and had participated in questionable self-
18   dealing with bank insiders, and established lending policies that negatively implicated numerous
     laws); *Martinez v. Rocky Mountain Bank* (2013) 540 Fed.Appx. 846 (10th Cir. 2013) (plaintiff
19   was President and Regional VP of bank; shortly after federal regulators deemed bank to be in
     'troubled condition', bank terminated plaintiff; Bank refused to certify because plaintiff was
20   involved in originating risky loans that resulted in significant losses for the bank, leading to its
     'troubled condition' designation); *Mt. Heritage Bank v. Rogers* (2012) 728 S.E.2d 914, 2012
21   Ga.App.Lexis 551 (Ct.App.GA 2012) (plaintiff was Senior VP of bank and was terminated;
     regulators had deemed bank to be in troubled condition based upon unsafe, unsound banking
22   practices and violations of law pertaining to its operations and loans; bank would not certify
     because plaintiff's performance as a loan officer caused him to be substantially responsible for
23   the bank's troubled condition); *Bauer v. FDIC*, 2023 US Dist Lexis 174720 (D.D.C. 2023)
     (plaintiffs were two senior executives who were terminated by Bank; after they became
24   employed, Bank began experiencing financial difficulties and regulators issued a report detailing
     the deficient management practices of the two plaintiffs that had significantly contributed to the
25   Bank's financial woes.)

26   [22]

27

28
                                    29

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

for the Bank's "troubled condition" and that the Board's determination was unfounded (and thus arbitrary, capricious or an abuse of discretion) that should be the end of the matter. It would be indefensible to deny Richards his earned compensation if he was not "substantially responsible" for the 2015 Wholesale Consent Order since this was the linchpin of the Board's reason for denial. Nevertheless, the Board also claimed that several other "discretionary" factors supported its decision to deny his application.

In 12 USC 1828(k)(2), Congress listed six factors that the FDIC may consider in making golden parachute decisions. The federal regulations incorporate those six factors. The critical evaluation involves the first three statutory factors---whether the employee engaged in any misconduct and/or was "substantially responsible" for the bank's "insolvency or troubled condition". 12 CFR Sec. 359.4(a)(4)(i—iv). In addition, the federal regulators "may consider" the three discretionary factors listed in 12 CFR Section 359.4(b)(1)-(3). These three discretionary factors are: 1) whether and to what degree the IAP was in a position of managerial or fiduciary responsibility; 2) the length of time the IAP was affiliated with the institution and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment; and 3) any other factors or circumstances that would indicate that the proposed payment would be contrary to the intent of Congress in creating the 'golden parachute' statute. The regulators need not give any weight to these three discretionary factors—none is controlling and there is no requirement that more or less weight be given to any of them. *Knyal v. OCC*, 2003 US Dist. Lexis 28513 (N.D.Cal. 2003).

1.    The Fact That Richards Held a Position of "Managerial Responsibility" at the Bank Does Not Mean that He was "At Fault" for Wholesale's Documentation Problem

First, the Board noted that Richards was a senior officer "in a position of managerial and fiduciary responsibility" and so "shared responsibility" for criticisms about Wholesale's internal BSA/AML program. AR:3819. This is the same faulty logic used by the Board to conclude that Richards was "substantially responsible" for the Wholesale Consent Order, i.e., simply because Richards was the head of FCRM and the BSA Officer, he is "automatically" to blame for any

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS          Case No. 3:25-cv-3915-LB

1    internal problems within Wholesale.  As discussed above, this is completely baseless in light of

2    the fact that Richards had no operational authority over Wholesale's internal BSA/AML

3    program; he did everything reasonable within the limits of his authority to assist Wholesale; ███

4    ████████████████████████████████████████

5            Next, the Board states that the Bank's decision not to provide a certification letter

6    presumably meant that the Bank had a reasonable basis to believe that Richards was

7    substantially responsible for the Bank's "troubled condition", and that the Bank's decision

8    carries "great weight".  AR:3819.  Once again, there is no evidentiary basis to support the notion

9    that Richards did anything "wrong".  Just as the Bank did, the Board "blamed" Richards for

10   Wholesale's documentation problem simply because Richards was the BSA Officer.  In fact,

11   Richards was the *whistleblower* here and did not do anything "wrong".  As discussed above,

12   when the Bank told Richards that it would not write a certification letter and was canceling two

13   of his RSR awards, Richards and his attorneys asked the Bank to identify *anything* that Richards

14   had done that justified the Bank's actions.  The Bank was unable to do so---other than repeat the

15   fact that Richards was the BSA Officer during this time period.  AR:14—15; 3416—17.

16           2.    The Length of Richards' Tenure and the Amount of Compensation At Issue

17           With respect to the "second" discretionary factor (the length of Richards' tenure and the

18   size of the requested compensation), Richards served at the Bank for over 12 years, and the two

19   RSR awards he is now seeking collectively had "a value of approximately $456,378", according

20   to the Legal Division recommendation letter to the Board.  AR:3800; 3811. The Board stated

21   that payment of this compensation "seems unreasonable" in light of the compensation Richards

22   had already received over the years.  AR:3819.  This is outlandish.  The two RSR awards

23   together were deemed to have approximately the same value as one year of Richards' salary

24   ($425,000).  AR:120; 169; 3810. This is not a situation in which a bank executive had only been

25   employed for three years and was requesting two years' worth of salary as severance (see,

26   *Wohlschlager*, supra), or in which seven executives were seeking severance pay ranging from

27   $743,00 to $2,145,00 *each* (*BBX Capital v. FDIC*, 2018 US Dist. Lexis 222769 (S.D.Fla. 2018)).

28   Richards worked for more than 12 years and is simply seeking to receive the compensation that

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

31

he had <u>earned</u> in 2017 and 2018 as part of his annual compensation package.[23]

Incredibly, in its Denial Letter, the Board also stated as part of this "second" discretionary factor that, "*During this period [when Richards' RSR awards were outstanding], the Company paid a civil money penalty of $67.8 million for sanctions violations, which was an area of your responsibility.*" AR:3808; 3819. The Board's use of this as a "factor" is outrageous. First, there is no explanation given—either in the Denial Letter or in the Administrative Record—as to what this $67.8 million penalty was for or what it related to (other than a vague reference that it related to 'unsafe and unsound practices'). *Id.* Second, there is no explanation given anywhere as to how *Richards* was in any way responsible or at fault for this penalty. Third, this penalty occurred in 2023 (AR:3808)—five years *after* Richards had retired—and Richards had no idea that the Board was even considering using this as a factor in denying him compensation he had earned in 2017 and 2018. Richards had no opportunity to ever be heard about the Board's claim that he should be held "responsible" for this penalty or that this penalty would be used as a factor. As discussed in Section VII below, the Board's action violated Richards' constitutional due process rights. If Richards had been given an opportunity to respond to this issue, he would have been able to clearly explain that he was in no way "responsible" or "at fault" for the subject of this penalty.

An agency's action will be deemed arbitrary and capricious under the APA where the agency has offered an explanation for its decision that "runs counter to the evidence". *Defenders of Wildlife v. U.S. Dept. of Natural Resources*, 733 F.3d 1106, 1115(11th Cir. 2013). Here, the Board has offered <u>no evidence</u> to explain how Richards was "responsible" for this $67 million penalty, nor any evidence to explain what this penalty was even for. Therefore, the inclusion of this as a factor in the Board's denial is arbitrary, capricious and an abuse of discretion.

---

[23] ███████████████████████████████████████████████████████████ See, *WMI Liquidating Trust v. FDIC,* 110 F.Supp.3d 44 (D.D.C. 2015). In fact, there are numerous cases in which the Board has approved payments for less than the full amount requested by the plaintiff. See, e.g., *Wohlschlager v. FDIC*, 992 F.3d 574 (6th Cir. 2021) (approving payment of one year's salary as severance but not the two years of salary requested by plaintiff per the contract's terms).

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS          Case No. 3:25-cv-3915-LB

1      The Bank's explanation to the Board for cancelling two of Richards' RSR Awards after he

2   retired--and for refusing to write a certification letter--was that since Richards was the BSA

3   Officer, he should automatically be blamed for the Wholesale Consent Order.  But there is

4   *another* explanation for the Bank's negative actions towards Richards after he retired which

5   Richards repeatedly raised but which the Board *completely ignored*: that the Bank was

6   **retaliating** against Richards because of his repeated whistleblowing with respect to Wholesale.

7      Wholesale was upset with Richards for numerous reasons: because Richards repeatedly

8   told his boss and the BOD about Wholesale giving false and misleading reports regarding

9   Wholesale's remediation efforts; because Richards had repeatedly warned the BOD about

10  Wholesale's internal documentation deficiencies in the years leading up to the Wholesale

11  Consent Order; and because Richards had informed the BOD about Wholesale's refusal to

12  accept programs and assistance that FCRM had offered.  AR:9—14; 3423—28.

13     But most significantly, as discussed above at page 11, Wholesale and certain others at the

14  Bank were very upset with Richards in early 2018 because Richards learned that Wholesale had

15  been involved in a *massive fraud* in which Wholesale was fabricating phony BOC documents.

16  AR:13—14; 3428.   Richards immediately contacted the Bank's senior management and insisted

17  that the Bank promptly report Wholesale's fraud ███████—which Richards did.  *Id.*  Both

18  Richards's boss (Mike Loughlin, the Chief Risk Officer) ███████████████████

19  ███████ told Richards shortly before he retired that certain persons at the Bank were upset

20  with Richards' whistleblowing, and ███ were concerned that he might be retaliated against by

21  the Bank.  AR:13—14; 483—84; 3428.



Incredibly, the Board does not say a single word about this possible "retaliation"  anywhere in

28

33

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

1  the Administrative Record.  The Board simply ignored it and apparently never spoke to anyone

2  about this issue, including failing to interview either Mr. Loughlin or Ms. Smith (or anyone else

3  from the OCC or the Bank) about whether retaliation by the Bank against Richards should be a

4  concern here.

5      One of the bases for finding that an agency determination is arbitrary, capricious and an

6  abuse of discretion is that the agency, "**entirely failed to consider an important aspect of the**

7  **problem**".  See, *M & T Farms, supra*.  Here, the Board failed to investigate or give *any*

8  consideration to a critical reason raised by Richards as to why the Bank took away two of his

9  RSR awards and refused to write a certification letter.  For this reason alone, the Board's

10  decision should be overturned.

11      3.      There Would Be No Impact on the Bank's Financial Condition

12      As to the "third" discretionary factor—any other factors or circumstances indicating that

13  payment to Richards would be contrary to the intent of the 'golden parachute' statute—

14  ██████████████████████████████████████████████████████ RSR

15  ████████████████████████████████████████████ AR:3804; 3815; 3819.

16  This is critical because one of the major reasons for Congress restricting golden parachute

17  payments was to prevent a bank that was already in financial distress from *further* draining its

18  assets by giving them to executives who had engaged in misconduct that had contributed to that

19  financial distress.  See, discussion at pages 16--17, *supra*.  Thus, there is no reason under this

20  factor to deny Richards his RSR compensation.

21      Yet instead of using this as a factor in favor of paying Richards, the Board instead said that

22  the regulations did not favor paying senior managers who were "responsible for a bank's poor

23  condition" and that Richards "shared responsibility" for Wholesale's BSA program. AR: 3819.

24  As discussed above, this assertion is unsupported by the Administrative Record.

25      Finally, the Board's decision to deny Richards his RSR compensation was especially

26  inequitable because the timing of Richards' retirement *arbitrarily* threw him into the

27  "certification window" selected by the OCC.  After more than 12 years at Wells Fargo, Richards

28  chose to retire from the Bank on April 2, 2018. ███████████████████████████████

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

34

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████     This means that if Richards had

5 decided to retire on April 21, 2018 rather than on April 2, 2018, he would never would have

6 fallen ████████████████████████ and he would have received his RSRs years ago.

7 AR:3439.

8 **VII.    THE BOARD VIOLATED RICHARDS' DUE PROCESS RIGHTS**

9          Under the APA, a court must overturn and hold unlawful agency action that was "contrary

10 to constitutional right" or was taken "without observance of procedure required by law."  5 USC

11 Secs. 706(2)(B), (D).  The Fifth Amendment to the United States Constitution prohibits the

12 federal government from depriving any citizen of his or her property without due process. ("No

13 person shall…be deprived of life, liberty or property, without due process of law). Thus, the

14 government must provide a fair process and fair procedures before depriving an individual of his

15 or her property.

16          "The fundamental requirement of due process is the opportunity to be heard at a

17 meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333, 96

18 S.Ct. 893, 47 L.Ed.2d 18 (1976).  This means that individuals must have the opportunity to be

19 heard, present evidence and defend themselves before the government can take action against

20 them, including depriving the individual of his or her property.  See, *Stone v. FDIC*, 179 F.3d

21 1368 (Ct.App. Fed.Cir.) (1999) (the essential requirements of due process are notice and an

22 opportunity to respond; the opportunity to present reasons, either in person or in writing, why

23 proposed action should not be taken is a fundamental due process requirement); *Cleveland

24 Board of Educ. v. Loudermill*, 470 U.S. 532, 542-46, 84 L.Ed2d 494, 105 S.Ct. 1487 (1985)

25 (same).

26          The RSRs which Richards had earned and been awarded in 2017 and 2018 were <u>fully

27 vested</u> as of 2022.  AR:190—98; 199—207; 3386. Thus, as of March 13, 2025 (the date when

28 the Board issued its denial letter), Richards' deferred compensation had vested and so was his

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND APPENDIX OF EXHIBITS          Case No. 3:25-cv-3915-LB

property.  The Board's March 2025 decision to deprive Richards of his property was done without the government having provided Richards the fair process and procedures required by the Constitution.  Instead, the Board reached its decision in secret, without ever offering Richards the opportunity to see the evidence that the Board had received and was considering; without Richards knowing what information the Bank had provided to the Board; without ever offering Richards the opportunity to know the factors or reasons that the Board was considering; and without offering Richards the opportunity to be heard by the Board or to respond to the evidence or factors that the Board was secretly considering before the Board issued its decision.

Richards was required to submit an application in 2021 but had no ability thereafter to know what "evidence" had been presented by the Bank to the Board, nor what purported facts or factors the Board was considering before making its decision.  For example, the Board cited as a factor that Wells Fargo had been assessed a $67 million penalty in 2023.  Richards had no idea that the Board was considering this penalty as a factor and so had no opportunity to respond and demonstrate that he was in no way at fault for, or should be held responsible for, this penalty.  Similarly, Richards had no idea that the Board was falsely claiming (without any factual basis) that Richards had allegedly "undercut" the Wholesale remediation process after the 2015 Consent Order.

"The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it."  *Mathews v. Eldridge,* supra, 424 U.S. at 349.  The Board will undoubtedly argue that Richards has an "opportunity to be heard" because he has the right under the APA to file for "judicial review" of the Board's decision.  But the Court's review is limited to the *existing Administrative Record*, and so Richards has no opportunity to provide evidence in response to the "$67 million penalty" issue nor to rebut the patently false assertion that he "undercut" Wholesale's remediation efforts, nor to respond to any other factors or evidence relied upon by the Board.  Furthermore, the APA's standard of judicial review is "arbitrary and capricious", which makes it particularly difficult for Richards to reverse the Board's decision.

In *Mathews*, the Supreme Court stated that three factors should be considered when

1   reviewing the constitutional sufficiency of administrative procedures.  First, the private interest

2   that will be affected by the official action.  Second, the risk of an erroneous deprivation of such

3   interest through the procedures used, and the probable value of additional procedural safeguards.

4   And third, the government's interest, including the fiscal and administrative burdens that the

5   additional procedures would entail.  *Mathews, supra*, 424 U.S. 319 at 332—335.

6       Here, all three factors weigh in favor of Richard being provided some opportunity to

7   respond to the Board's "evidence" before the Board makes its final determination.  First,

8   Richards had a significant financial interest affected by the Board's action—the deprivation of

9   $456,000 of his earned compensation.  Second, there is a major risk of an *erroneous* deprivation

10  since Richards did not know what evidence or facts the Board was considering and thus had no

11  opportunity to respond.  Third, Richards is not asking that he be provided with a full in-person

12  evidentiary hearing with witnesses, etc.  But at a minimum, due process requires that Richards

13  be given a written summary of the evidence being considered by the Board, and a copy of the

14  Board's "tentative decision" and reasons, and that he be afforded the opportunity to respond in

15  writing and offer his own evidence and argument in rebuttal before the Board makes a final

16  determination.

17      The Supreme Court has stressed that "due process is flexible" and calls for such procedural

18  protections as the particular situation demands, i.e., the procedures must be tailored to ensure

19  that the person is given a meaningful opportunity to present his case.  *Mathews, supra,* 424 U.S.

20  319.  In *Mathews,* for example, the Court evaluated what types of due process protections were

21  required before an agency could terminate a person's disability benefits.  The Court said that

22  although a full in-person evidentiary hearing was not required, due process mandated that the

23  agency send the affected individual a letter with its 'tentative determination' and a statement of

24  the reasons for its proposed decision, after which the individual would have the opportunity to

25  respond in writing and submit rebuttal information to the agency.  The agency was not permitted

26  to make a "final" determination until after the individual had been given this opportunity.

27      In our case, it would certainly place no burden upon the Board to send Richards a tentative

28  decision with a full statement of the Board's reasons and the evidence it was relying upon, and

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

37

allow Richards the opportunity to then respond in writing and present additional evidence to the Board in support of his position and to correct factual errors or mistaken assumptions by the Board. Indeed, the Board was obviously in no hurry to make a decision here since almost four years passed between the time Richards submitted his application in July 2021 and the Board issued its Denial Letter in March 2025. AR:1—29; 3817—20. Taking a few extra months in order to allow Richards to have a true opportunity to be heard by the Board before it deprived him of his earned compensation would seem to be the bare minimum required by due process.

## VIII.   CONCLUSION

The Board's decision to deprive Richards of compensation that he had earned prior to his retirement is a travesty. Richards was the one person at the Bank who tried to do the right thing. He not only repeatedly attempted to provide Wholesale with assistance (which Wholesale often rejected) but he then fulfilled his duty as BSA Officer by becoming a whistleblower when Wholesale engaged in misleading and fraudulent conduct—whether that took the form of Wholesale lying to the Wells Fargo Board of Directors ████████ about the purported 'remediation progress' that Wholesale was making, or whether it took the form of outright fraud in fabricating BOC documents. Richards should have been thanked by the Bank for the 12 years of outstanding service he provided. Instead, the Bank and the Board have now attempted to take away part of the compensation he earned—compensation which the Bank had awarded him in recognition of his excellent performance.

The Board's decision to deny Richards his deferred compensation should be reversed, since that decision was arbitrary, capricious, an abuse of discretion and not in accordance with law.


Dated: January 9, 2026                    McGUINN, HILLSMAN & PALEFSKY


                                          By:___/s/Keith Ehrman_____
                                             Keith Ehrman
                                             Cliff Palefsky
                                             Attorneys for Plaintiff

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

**EXHIBIT  S**

**#2015-125**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

|  |  |  |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| | ) | |
| Wells Fargo Bank, National Association | ) | AA-EC-2015-79 |
| Sioux Falls, South Dakota | ) | |
| | ) | |

**CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), has conducted examinations of Wells Fargo Bank, National Association,

Sioux Falls, South Dakota ("Bank").  The OCC has identified deficiencies in an internal control

pillar of the Bank's program for Bank Secrecy Act/Anti-Money Laundering ("BSA/AML")

compliance covering the Wholesale Banking Group line of business and has informed the Bank

of these findings.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a Stipulation and Consent to the Issuance of a Consent Order, dated 11/19/15, that is

accepted by the Comptroller ("Stipulation").  By this Stipulation, which is incorporated herein by

reference, the Bank has consented to the issuance of this Consent Cease and Desist Order

("Order") by the Comptroller.  The Bank has begun corrective action, and has committed to

taking all necessary and appropriate steps to remedy the deficiencies identified by the OCC, and

to enhance the Bank's BSA/AML compliance program covering the Wholesale Banking Group.

1

FRB-AR-003592

## ARTICLE I

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)     The OCC's examination findings establish that the Bank has failed to make acceptable substantial progress toward correcting previously identified BSA/AML problems that were previously brought to its attention relating to due diligence practices and customer risk assessment in the Bank's Wholesale Banking Group resulting in a violation of 12 U.S.C. § 1818(s).

(2)     The OCC's examination findings also establish that critical internal control deficiencies in the Wholesale Banking Group's BSA/AML compliance program resulted in an internal control pillar violation (12 C.F.R. § 21.21(d)(1)) based on the following:

> (a)     The Bank's BSA/AML customer risk assessment practices across the Wholesale Banking Group line of business within the Bank are not effective;
>
> (b)     The Bank's customer due diligence practices within the Wholesale Banking Group line of business are unsatisfactory;
>
> (c)     Relationship staff and front-line monitoring efforts are less than satisfactory in the Wholesale Banking Group line of business; and
>
> (d)     Governance and oversight practices are not effective as evidenced by management's failure to fully address previously cited BSA/AML problems within the Wholesale Banking Group.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818(b), the Comptroller hereby ORDERS that:

2

FRB-AR-003593

ARTICLE II

COMPLIANCE COMMITTEE

(1)     The Board shall appoint and maintain a Compliance Committee of at least three

(3) members, of which a majority shall be directors who are not employees or officers of the

Bank or any of its subsidiaries or affiliates.  The Compliance Committee shall be responsible for

overseeing and monitoring the Bank's adherence to the provisions of this Order.  The

Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2)     Within thirty (30) days after the determination of no supervisory objection to the

Action Plan described in Article III, and thereafter within thirty (30) days after the end of each

quarter, the Compliance Committee shall submit a written progress report to the Examiner-in-

Charge at the Bank ("Examiner-in-Charge") setting forth in detail the actions taken to comply

with each Article of this Order, and the results and status of those actions, including

improvements to the BSA/AML compliance program covering the Wholesale Banking Group.

(3)     A copy of the Compliance Committee's report shall also be forwarded to the

Board and shall be reviewed by the Board at its next regularly scheduled meeting following

submission of such report to the Examiner-in-Charge.

ARTICLE III

COMPREHENSIVE BSA/AML ACTION PLAN

(1)     Within sixty (60) days of the effective date of this Order, the Bank shall submit to

the Examiner-in-Charge for review and determination of no supervisory objection by the Deputy

Comptroller for Large Bank Supervision ("Deputy Comptroller") a plan containing a detailed

FRB-AR-003594

description of the actions that are necessary and appropriate to achieve full compliance with Articles IV through VII of this Order ("BSA/AML Action Plan" or "Plan"). The Plan shall specifically include assessments of the Wholesale Banking Group's BSA/AML compliance program organizational structure, accountability and oversight, staffing requirements, internal controls (including first and second line of defense quality assurance testing), customer due diligence processes, customer risk assessment processes, front-line monitoring, and the BSA/AML training regimen. The Bank shall implement the BSA/AML Action Plan upon the Deputy Comptroller's issuance of a written determination of no supervisory objection. In the event the Deputy Comptroller requires the Bank to revise the Plan, the Bank shall promptly make and the Board shall approve necessary and appropriate revisions and resubmit the BSA/AML Action Plan to the Examiner-in-Charge for review and determination of no supervisory objection by the Deputy Comptroller. Following implementation, the Bank shall not take any action that will cause a significant deviation from, or material change to, the BSA/AML Action Plan unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller. The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the BSA/AML Action Plan. The Board shall further ensure that, upon implementation of the BSA/AML Action Plan, the Bank achieves and maintains an effective BSA/AML compliance program for the Wholesale Banking Group, in accordance with the BSA and its implementing regulations. In each instance in this Order in which the Board is required to ensure adherence to or undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

FRB-AR-003595

(a)     Authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings;

(b)     Require the timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(c)     Provide for periodic, independent assessments of management's remediation efforts, complete with formal, written reporting of results;

(d)     Require corrective action be taken in a timely manner for any non-compliance with such actions; and

(e)     Follow-up on any non-compliance with such actions in a timely and appropriate manner.

(2)     The BSA/AML Action Plan must specify timelines for completion of each of the requirements of Articles IV through VII of this Order.  The timelines in the BSA/AML Action Plan shall be consistent with any deadlines set forth in these Articles, unless modified by written agreement with the Deputy Comptroller.  Any deviations from specified timelines subsequent to the issuance of this Order must be approved in advance by the Deputy Comptroller.

(3)     The BSA/AML Action Plan must include a detailed description of the actions that are necessary and appropriate to achieve full compliance with all outstanding BSA/AML Matters Requiring Attention issued to the Wholesale Banking Group.

(4)     Upon request by the Deputy Comptroller or the Examiner-in-Charge, the Bank shall modify the BSA/AML Action Plan to address any additional Matters Requiring Attention concerning BSA/AML matters, or citations of violations of law concerning BSA/AML matters, which the OCC may issue to the Bank following the effective date of this Order.

5

(5)     The Bank shall ensure that it has sufficient processes, personnel, and control systems to implement and adhere to this Order.  The BSA/AML Action Plan must specify in detail staffing plans that are necessary to achieve and maintain full, ongoing compliance with Articles IV through VII of this Order.

(6)     Within ten (10) days of this Order, the Bank shall designate an officer to be responsible for coordinating and submitting to the OCC the written plans, reports, and other documents required to be submitted under the terms and conditions of this Order.

ARTICLE IV

BSA/AML CUSTOMER RISK ASSESSMENT

(1)     As required by Article III, the Bank shall conduct a comprehensive assessment of the Wholesale Banking Group's BSA/AML risk of customer relationships.  The comprehensive risk assessment of customer relationships shall include:

(a)     A BSA/AML customer risk-rating methodology to identify and review all elements of customer relationships across the Wholesale Banking Group and other lines of business, regions and countries (as permitted by jurisdiction) as applicable;

(b)     The methodology should assess inherent BSA/AML risk holistically for Wholesale Banking Group customer relationships spanning multiple lines of business, if applicable.  This methodology shall result in the development of a comprehensive approach to quantifying BSA/AML risk for new and existing customers of the Wholesale Banking Group.  The quantification of risk shall encompass a customer's entire relationship

6

FRB-AR-003597

with the Bank, include the purpose of the account, actual or anticipated
activity in the account (e.g., type, volume, and value (number and dollar)
of transaction activity engaged in), nature of the customer's business or
occupation, customer location (e.g., customers' geographic location,
where they transact business, and have significant operations), types of
products and services used by the customer, material changes in the
customer's relationship with the Bank, as well as other factors discussed
within the FFIEC BSA/AML Examination Manual;

(c)     The customer risk assessment methodology shall be reassessed
periodically, the timeframe for which shall not exceed twelve months, or
whenever there is a significant change in BSA/AML risk within the
Wholesale Banking Group.  The BSA/AML customer risk assessment
methodology shall also be reviewed by internal audit for the adequacy of
identification of risk; for controls to manage identified risks; for gap
analyses where controls are not sufficient; and for action plans to address
gaps.

(2)   Within sixty (60) days of completing the assessment required pursuant to
paragraph (1) of this Article, the Bank shall integrate any recommended remediation
into the Action Plan required by Article II.   If the Examiner-in-Charge recommends
changes to the assessment, the Bank shall incorporate those changes or suggest
alternatives that are acceptable to the Examiner-in-Charge.

FRB-AR-003598

ARTICLE V

<u>CUSTOMER DUE DILIGENCE AND ENHANCED DUE DILIGENCE</u>

(1)     Within ninety (90) days of the effective date of this Order, the Bank shall ensure that appropriate customer due diligence policies, procedures, processes, and training for the Wholesale Banking Group are developed.  Customer due diligence shall be commensurate with the customer's risk profile, and sufficient for the Wholesale Banking Group to develop an understanding of normal and expected activity for the customer's occupation or business operations.  The customer due diligence process shall include the following items:

(a) Information regarding the client's/customer's relationships within the Wholesale Banking Group.  This includes accounts within multiple lines of business, regions, and countries (as permitted by jurisdiction).  The relationship includes information obtained on owners, principals, signers, subsidiaries, affiliates, and parties with the ability to manage or control the account or client (in accordance with the FFIEC BSA/AML Examination Manual and the Interagency Guidance on Beneficial Ownership Information (OCC 2010-11), as well as industry standards);

(b) An electronic due diligence database, which includes information specified in subparagraph (a) above, that is readily accessible to the relationship manager or other parties responsible for the customer relationship, BSA/AML compliance personnel, suspicious activity monitoring alert analysts and investigators, and quality control and assurance personnel;

FRB-AR-003599

(c)     Customer due diligence shall be periodically updated to reflect changes in the customer's behavior, activity profile, derogatory information, periodic reviews of the customer relationship, or other factors that impact the BSA/AML risk for the client.  The periodic updates shall be documented, and subject to quality assurance processes;

(d)     The client relationship BSA/AML risk shall be detailed in the customer due diligence record, along with the supporting factors, including transaction activity, geographies involved, and front-line monitoring results, among others;

(e)     Specialized or enhanced due diligence for higher risk clients and/or products and services shall be implemented across the Wholesale Banking Group.  These due diligence standards shall comply with the FFIEC BSA/AML Examination Manual, the Interagency Guidance on Beneficial Ownership Information (OCC 2010-11), as well as industry standards; and

(f)     Processes to periodically review, based on the relationship risk, the type, volume, and value of customer activities in relation to normal and expected levels.  The purpose of these reviews shall be to determine if the customer's activity is reasonable, that customer due diligence is current and complete, and the customer risk rating is accurate.  These reviews shall be documented and quality assurance processes must ensure the reviews are comprehensive and accurate.  Standards and processes shall be established for elevating reviews for additional management consideration

9

regarding increased monitoring, additional due diligence, or account
closure.

(2)      Upon completion, the Bank shall submit its policies and procedures for customer
due diligence to the Examiner-in-Charge.  If the Examiner-in-Charge recommends changes to
the policies or procedures, the Bank shall incorporate those changes or suggest alternatives that
are acceptable to the Examiner-in-Charge.

## ARTICLE VI

## FRONT-LINE MONITORING AND CUSTOMER DUE DILIGENCE SYSTEM

(1)      The Bank shall implement and thereafter shall maintain an effective system/tool
that provides relationship staff within the Wholesale Banking Group with the ability to update
customer due diligence information as necessary, to better understand the customer activities,
and to assist in identification of any unusual or suspicious activity to ensure that the Bank
continues to comply with regulatory requirements regarding the timely filing of Suspicious
Activity Reports ("SARs"), pursuant to 12 C.F.R. § 21.11.

(2)      Management's implementation of a system/tool shall ensure the following:

(a)      The integrity of data feeding the system/tool;

(b)      That the system/tool has been sufficiently tailored for the size and
complexity of Wholesale Banking Group customers; and

(c)      Periodic reviews and/or adjustments of monitoring settings and thresholds
by a qualified party sufficiently independent of the Wholesale Banking
Group.

10

(3)    Once implemented, the Bank shall develop and deliver specialized training on usage of the system/tool for all relationship staff and front line management within the Wholesale Banking Group.  The objective of this training will be to facilitate usage of the monitoring system/tool, and to ensure the awareness of relationship staff of their responsibility for compliance with the reporting requirements associated with SARs, pursuant to 12 C.F.R. Part 21, subpart B.

(a)    This training program shall be periodically updated and subject to periodic testing by first, second, and third line of defense BSA/AML compliance units.

ARTICLE VII

OVERSIGHT AND GOVERNANCE

(1)    Within ninety (90) days of the effective date of this Order, the Bank shall conduct an evaluation of the adequacy of staffing with respect to experience level, specialty expertise regarding BSA/AML, and the number of the individuals employed within the Wholesale Banking Group to ensure sound governance and oversight over all efforts to comply with this Order and strengthen the Wholesale Banking Group's BSA/AML program.  The Bank shall conduct quarterly evaluations of the sufficiency of staffing resources within the Wholesale Banking Group.  Results of these evaluations shall be included in the reports provided to the Examiner-in-Charge as required by Article II of this Order.

(2)    The Bank shall ensure and document that there are clear lines of authority and responsibility for BSA/AML compliance responsibilities within the Wholesale Banking Group (i.e., first line of defense) and within corporate oversight functions (i.e., second and third lines of

11

defense).  The roles and responsibilities of the three lines of defense shall be formally

documented as part of the BSA/AML Action Plan required by Article III of this Order.

(3)    The Bank shall ensure that senior management and line of business management

within the Wholesale Banking Group are accountable for effectively implementing bank policies

and procedures, and fulfilling BSA/AML obligations. Specifically, the Bank shall incorporate

BSA/AML compliance responsibilities into job descriptions and into the performance evaluation

process for all Wholesale Banking Group personnel.


ARTICLE VIII

APPROVAL, IMPLEMENTATION, AND REPORTS

(1)    The Bank shall submit the written plans, programs, policies, and procedures

required by this Order for review and determination of no supervisory objection to the Examiner-

in-Charge within the applicable time periods set forth in Articles III through VII.  The Board

shall ensure that the Bank submits the plans, programs, policies, and procedures to the Examiner-

in-Charge for prior written determination of no supervisory objection.  In the event the Deputy

Comptroller or Examiner-in-Charge asks the Bank to revise the plans, programs, policies, or

procedures, the Bank shall promptly make necessary and appropriate revisions and resubmit the

materials to the Examiner-in-Charge for review and determination of no supervisory objection.

Upon receiving written notice of no supervisory objection from the Deputy Comptroller or

Examiner-in-Charge, the Board shall ensure that the Bank implements and thereafter adheres to

the plans, programs, policies, and procedures.

FRB-AR-003603

(2)    During the term of this Order, the required plans, programs, policies, and procedures shall not be amended or rescinded in any material respect without a prior written determination of no supervisory objection from the Deputy Comptroller or Examiner-in-Charge.

(3)    During the term of this Order, the Bank shall revise the required plans, programs, policies, and procedures as necessary to incorporate new, or changes to, applicable legal requirements and supervisory guidelines.

(4)    The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required by this Order.

(5)    All communication regarding this Order shall be sent to:

> Bradley Linskens
> Examiner-in-Charge
> National Bank Examiners
> 343 Sansome Street, Suite 1150
> San Francisco, CA 94163

or such other individuals or addresses as directed by the OCC.

## ARTICLE IX

## OTHER PROVISIONS

(1)    Although this Order requires the Bank to submit certain actions, plans, programs, and policies for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2)    If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action

FRB-AR-003604

affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(3)      This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the practices and violations of law or regulation described in the Comptroller's Findings set forth in Article I of this Order.  The Comptroller releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the Comptroller based on the practices and violations described in in Article I of the Order, to the extent known to the Comptroller as of the effective date of the Order.  Nothing in the Stipulation or this Order, however, shall prevent the Comptroller from:

(a)      instituting enforcement actions, other than a cease and desist order, against the Bank based on the findings set forth in Article I of this Order;

(b)      instituting enforcement actions against the Bank based on any other findings;

(c)      instituting enforcement actions against the Bank's institution-affiliated parties based on the findings set forth in Article I of this Order, or any other findings; or

(d)      utilizing the findings set forth in Article I of this Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

Further, nothing in the Stipulation or this Order shall affect any right of the Comptroller to determine and ensure compliance with the terms and provisions of the Stipulation and this Order.

FRB-AR-003605

(4)    This Order is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below.  The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller or his authorized representative.

(5)    Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise.  The time limitations may be extended in writing by the Deputy Comptroller for good cause upon written application by the Board.  Any request to extend any time limitation shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with the time limitation, and shall be accompanied by relevant supporting documentation.  The Deputy Comptroller's decision regarding the request is final and not subject to further review.

(6)    The terms and provisions of this Order apply to Wells Fargo Bank, National Association and all its subsidiaries, even though those subsidiaries are not named as parties to this Order.  The Bank shall integrate any activities done by a subsidiary into its plans, policies, programs, and processes required by this Order.  The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

(7)    This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States.  Without limiting the foregoing, nothing in this Order shall affect any action against the Bank or its institution-affiliated parties by a bank regulatory agency, the United States Department of Justice, or any other law enforcement agency.

FRB-AR-003606

(8)    The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

FRB-AR-003607

IT IS SO ORDERED, this <u>19</u> day of <u>November</u>, 2015

<u>/s/Greg Coleman</u>
Greg Coleman
Deputy Comptroller
Large Bank Supervision

FRB-AR-003608

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Wells Fargo Bank, National Association | ) | AA-EC-2015-79 |
| Sioux Falls, South Dakota | ) | |
| | ) | |

## STIPULATION AND CONSENT TO THE ISSUANCE
## OF A CONSENT ORDER

**WHEREAS**, the Comptroller of the Currency of the United States of America

("Comptroller"), based upon information derived from the exercise of his regulatory and

supervisory responsibilities, intends to issue a cease and desist order to Wells Fargo Bank,

National Association, Sioux Falls, South Dakota ( "Bank"), pursuant to 12 U.S.C. § 1818(b), for

violations of 12 U.S.C. § 1818(s) and 12 C.F.R. § 21.21(d)(1);

**WHEREAS**, in the interest of cooperation and to avoid additional costs associated with

administrative and judicial proceedings with respect to the above matter, the Bank, through its

duly elected and acting Board of Directors (the "Board"), has agreed to execute this Stipulation

and Consent to the Issuance of a Consent Order ("Stipulation"), that is accepted by the

Comptroller, through his duly authorized representative;

**NOW, THEREFORE**, in consideration of the above premises, it is stipulated by the

Bank that:

FRB-AR-003609

ARTICLE I

<u>JURISDICTION</u>

(1)      The Bank is a national banking association chartered and examined by the Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et seq.*

(2)      The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)      The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

ARTICLE II

<u>CONSENT</u>

(1)      The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the accompanying Consent Order by the Comptroller.

(2)      The terms and provisions of the Consent Order apply to the Bank and all of its subsidiaries, even though those subsidiaries are not named as parties to the Consent Order.

(3)      The Bank consents and agrees that the Consent Order shall be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), and consents and agrees that the Consent Order shall become effective upon its execution by the Comptroller through his authorized representative, and shall be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(4)      Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(b), and not as

FRB-AR-003610

a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(5)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute this Stipulation.

(6)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(7)     The Consent Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the practices and violations of law described in the Comptroller's Findings set forth in Article I of the Consent Order.  The Comptroller releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the Comptroller based on the practices and violations described in Article I of the Consent Order, to the extent known to the Comptroller as of the effective date of the Consent Order.  Nothing in this Stipulation or the Consent Order, however, shall prevent the Comptroller from:

(a)      instituting enforcement actions other than a cease and desist order against the Bank based on the findings set forth in Article I of the Consent Order;

(b)     instituting enforcement actions against the Bank based on any other findings;

3

FRB-AR-003611

      (c)      instituting enforcement actions against the Bank's institution-affiliated

parties based on the findings set forth in Article I of the Consent Order, or

any other findings; or

      (d)      utilizing the findings set forth in Article I of the Consent Order in future

enforcement actions against the Bank or its institution-affiliated parties to

establish a pattern or the continuation of a pattern.

Further, nothing in this Stipulation or the Consent Order shall affect any right of the Comptroller

to determine and ensure compliance with the terms and provisions of this Stipulation or the

Consent Order.

ARTICLE III

<u>WAIVERS</u>

(1)      The Bank, by executing this Stipulation and consenting to the Consent Order,

waives:

      (a)      Any and all rights to the issuance of a Notice of Charges pursuant to

12 U.S.C. § 1818(b);

      (b)      Any and all procedural rights available in connection with the issuance of

the Consent Order;

      (c)      Any and all rights to a hearing and a final agency decision pursuant to

12 U.S.C. § 1818(b) and (h), 12 C.F.R. Part 19;

      (d)      Any and all rights to seek any type of administrative or judicial review of

the Consent Order;

      (e)      Any and all claims for fees, costs, or expenses against the Comptroller, or

any of his agents or employees, related in any way to this enforcement

4

matter or the Consent Order, whether arising under common law or under

the terms of any statute, including, but not limited to, the Equal Access to

Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412;

(f)     Any and all rights to assert this proceeding, this Stipulation, consent to the

issuance of the Consent Order, and/or the issuance of the Consent Order,

as the basis for a claim of double jeopardy in any pending or future

proceeding brought by the United States Department of Justice or any

other governmental entity; and

(g)     Any and all rights to challenge or contest the validity of the Consent

Order.

ARTICLE IV

<u>ELIGIBLE BANK – OTHER PROVISIONS</u>

(1)     As a result of the Consent Order:

(a)     The Bank is an "eligible bank" pursuant to 12 C.F.R. § 5.3(g)(4) for the

purposes of 12 C.F.R. Part 5 regarding rules, policies and procedures for

corporate activities, unless otherwise informed in writing by the Office of

the Comptroller of the Currency ("OCC");

(b)     The Bank is not subject to the limitation of 12 C.F.R. § 5.51(c)(6)(ii) for

the purposes of 12 C.F.R. § 5.51 requiring OCC approval of a change in

directors and senior executive officers, unless otherwise informed in

writing by the OCC;

(c)     The Bank is not subject to the limitation on golden parachute and

indemnification payments provided by 12 C.F.R. § 359.1(f)(1)(ii)(C) and

5

FRB-AR-003613

12 C.F.R. § 5.51(c)(6)(ii), unless otherwise informed in writing by the OCC;

(d)     The Bank's status as an "eligible bank" remains unchanged pursuant to 12 C.F.R. § 24.2(e)(4) for the purposes of 12 C.F.R. Part 24 regarding community and economic development, unless otherwise informed in writing by the OCC; and

(e)     The Consent Order shall not be construed to be a "written agreement, order, or capital directive" within the meaning of 12 C.F.R. § 6.4, unless the OCC informs the Bank otherwise in writing.

## ARTICLE V

## CLOSING

(1)     The provisions of this Stipulation and the Consent Order shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, he deems it appropriate to do so to fulfill the responsibilities placed upon him by the several laws of the United States of America.

(2)     Nothing in this Stipulation or the Consent Order shall preclude any proceedings brought by the Comptroller to enforce the terms of the Consent Order, and nothing in this Stipulation or the Consent Order constitutes, nor shall the Bank contend that it constitutes, a release, discharge, compromise, settlement, dismissal, or resolution of any actions, or in any way affects any actions that may be or have been brought by any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice.

6

(3)     The terms of this Stipulation, including this paragraph, and of the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his representative, has hereunto set his hand on behalf of the Comptroller.

/s/Greg Coleman                                                            Nov. 19, 2015

_____          _____
Greg Coleman                                                              Date
Deputy Comptroller
Large Bank Supervision

FRB-AR-003615

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of Directors of Wells Fargo Bank, National Association, have hereunto set their hands on behalf of the Bank.


| /s/John G. Stumpf  (Chair) | November 17, 2015 |
| John G. Stumpf (Chair) | Date |


| /s/Lloyd H. Dean | November 17, 2015 |
| Lloyd H. Dean | Date |


| /s/Enrique Hernandez, Jr. | November 17, 2015 |
| Enrique Hernandez, Jr. | Date |


| /s/Cynthia H. Milligan | November 17, 2015 |
| Cynthia H. Milligan | Date |


| /s/James H. Quigley | November 17, 2015 |
| James H. Quigley | Date |


| /s/Judith M. Runstad | November 17, 2015 |
| Judith M. Runstad | Date |


| /s/Stephen W. Sanger | November 17, 2015 |
| Stephen W. Sanger | Date |

FRB-AR-003616