Cliff Palefsky (SBN 77683)
Keith Ehrman (SBN 106985)
McGUINN, HILLSMAN & PALEFSKY
220 Jackson Street, Suite 350
San Francisco, California 94111
Telephone:  (415) 421-9292
Facsimile:   (415) 403-0202
cp@mhpsf.com
keith@mhpsf.com
*Attorneys for Plaintiff*
JAMES RICHARDS

# UNITED STATES DISTRICT COURT

# IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES RICHARDS,<br><br>            Plaintiff,<br><br>v.<br><br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,<br><br>            Defendant. | CASE NO.: 3:25-cv-3915-LB<br><br>**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br>**[redacted]**<br><br><br>**Date:**       Thursday, May 21, 2026<br>**Time:**      9:30 am<br>**Dept:**      Courtroom B, 15th Floor<br><br>Magistrate Justice Laurel Beeler<br><br>Complaint filed May 5, 2025 |

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN
SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                    Case No. 3:25-cv-3915-LB

# **TABLE OF CONTENTS**

Page

I.    SUMMARY OF ARUGMENT ...................................................................................... 1

II.   RICHARDS WAS NOT "SUBSTANTIALLY RESPONSIBLE" FOR
      WHOLESALE'S INTERNAL DOCUMENTATION PROBLEM ............................. 5

III.  DEFENDANT'S OTHER ATTEMPTS TO "CRITICIZE" RICHARDS................... 10

IV.   RETALIATION.......................................................................................................... 12

V.    PLAINTIFF'S DEFERRED COMPENSATION WAS NOT A "GOLDEN
      PARACHUTE" PAYMENT ...................................................................................... 15

      A.    Richards' RSRs Were Not "Contingent on the Termination of His
            Employment" ............................................................................................... 15

      B.    The Federal Regulations Unlawfully Expanded the Statutory Definition
            of a "Golden Parachute" Payment. .............................................................. 18

      C.    Richards Clearly Has "Standing"................................................................. 19

VI.   DISCRETIONARY FACTORS ................................................................................. 20

VII.  THE BOARD VIOLATED RICHARDS' DUE PROCESS RIGHTS ....................... 23

VIII. CONCLUSION.......................................................................................................... 25

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

i

# TABLE OF AUTHORITIES

Page

**Cases**

*BBX Capital v. FDIC*
956 F.3d 1304 (11th Cir. 2020) ................................................................ 16

*Bauer v. FDIC*
38 F.4th 1114 (D.C.Cir. 2022) ................................................................. 19

*Donatoni v. Dept of Homeland Security*
184 F.Supp. 3d 285 (E.D.Va. 2016) ........................................................ 25

*Doolin v. FDIC*
53 F.3d 1395 (4th Cir. 1995) .................................................................... 24

*Fulani v. Brady*
935 F.2d 1324 (D.C. Cir. 1991) ............................................................... 20

*Guardians v. US Forest Service*
70 F.4th 1212 (9th Cir. 2023) ................................................................... 20

*Knyal v. OCC*
2003 US Dist. Lexis 28513 (N.D.Cal. 2003) ...................................... 17, 18

*Larison v. Ameris Bank*
2022 U.S. Dist. Lexis 128751 (M.D.Fla. 2022) ................................. 17, 18

*Loper Bright v. Raimondo*
603 U.S. 158, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) .......................... 18

*Mathews v. Eldridge*
424 U.S. 319 (1976) ................................................................................. 24

*Rohr v. Reliance Bank*
826 F.3d 1046 (8th Cir. 2016) ............................................................. 17, 18

**Statutes**

12 Code of Federal Regulations
§303.244(c) .............................................................................................. 19

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

ii

Page

**Statutes**

§359.4(a)(1) ..................................................................................... 15, 18, 20
§359.4(a)(4) ............................................................................................. 8, 9
§359.4(a)(4)(ii)............................................................................................. 8

12 U.S. Code
§1828 ....................................................................................................... 16

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

iii

PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN
SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:25-cv-3915-LB

## I.    SUMMARY OF ARUGMENT

Defendant's Opposition and Cross-Motion simply confirm what Plaintiff James Richards contended in his Motion for Summary Judgment:  that there is no evidence whatsoever that Richards did anything "wrong", and that the basis for the Board's denial was purely the fact that Richards held the position of BSA Officer at the time the 2015 Wholesale Consent Order was issued.  In other words, because of Richards' *job title*, he would <u>automatically</u> be deemed "substantially responsible" for Wholesale's internal documentation problem.  This is indefensible.

█████████████████████████████████████████████████████████ But this is not the same as saying t███████████████ Similarly, pointing out that Richards' FRCM group was "ultimately responsible" for all BSA matters (including Wholesale's BSA matters) does not mean that Richards himself was "substantially responsible" for causing Wholesale's internal documentation problem.  In fact, the ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In fact, Richards did everything *within the scope of his authority* to assist Wholesale and to then fulfill his duties as BSA Officer by reporting to his superiors when Wholesale was failing to make the proper changes or was engaging in misconduct or deceit.

Significantly, *prior* to Richards' retirement, neither the Bank nor any of the Bank's internal or external auditors had *ever* suggested that Richards was in any way to blame for Wholesale's documentation problems.  Two years after Richards' retirement---without having any "new" information—the Bank suddenly reversed direction and now claimed that Richards had been "substantially responsible" for Wholesale's documentation problem.  The Bank then refused to send a certification letter on Richards' behalf and also took away some of his previously granted RSRs.  The Bank's hostile actions toward Richards—long after he had

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

1

retired—were the first clear evidence that some individuals within the Bank were retaliating against Richards for his whistleblowing, just as Richards had been warned might happen by his boss and by ███████████████████████ .

In denying Richards' application for his RSR compensation, the Board relied heavily on the Bank's new, post-retirement assertion that Richards had been "substantially responsible" for Wholesale's deficiencies.  Defendant's February 20, 2026 MPA in Support of its Cross- Motion for Summary Judgment, pp. 5:11-16, 28:6--20 (hereafter "Def. Brief"). Yet both the Bank and the Board have been unable to identify a single thing that Richards did (or failed to do) that would support the notion that Richards was "substantially responsible" for Wholesale's documentation problem.  It is telling that the Board does not dispute—and cannot dispute--any of the following facts:

1) that as the Bank's BSA Officer, Richards was well aware of Wholesale's documentation deficiencies and had offered Wholesale numerous suggestions and recommendations to help fix those problems;

2) that because of the governance structure which Wells Fargo had created, Richards had no operational authority over Wholesale's internal BSA program or employees and so had no authority to "order" Wholesale to implement his suggestions or FCRM's programs;

3) that Wholesale often rejected or refused to adopt Richards' suggestions and programs that would have helped solve Wholesale's documentation problem;

4) that in the years before the 2015 Wholesale Consent Order, Richards repeatedly alerted both his boss (the Chief Risk Officer) and the Wells Fargo Board of Directors about Wholesale's ongoing documentation problem, including Wholesale's refusal to accept Richards' recommendations and programs, in eight different reports to the Bank's Board of Directors;

5) that after the 2015 Wholesale Consent Order, when Richards was assigned the task of monitoring Wholesale's remediation progress, Richards did so and also continued to offer suggestions and programs to Wholesale to assist with the remediation, which Wholesale again often refused to accept;

6) that after the 2015 Consent Order, Richards repeatedly informed the Board of Directors ███████████████ Wholesale was failing to take adequate steps, was rejecting his suggestions

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

2

and programs, and that Wholesale was giving ████ and the Bank's Board of Directors false, misleading and inaccurate information concerning Wholesale's supposed remediation progress;

7) ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

8) that because of Richards' whistleblowing actions and reports, Wholesale developed major antagonism toward Richards and called him a "troublemaker"; and

9) that both Plaintiff's boss and ████████████████ warned Richards shortly before he retired that he might be retaliated against by the Bank because Wholesale and others at the Bank were upset with Richards because of his whistleblowing actions.

In sum, Richards was a whistleblower who tried to do the right thing. He did everything *within the limits of his authority* to address Wholesale's documentation problem. For the Bank to suddenly claim five years after the 2015 Wholesale Consent Order was issued—and two years after he retired—that Richards had been "substantially responsible" for Wholesale's documentation problem is contrary to common sense, the facts and the law. There is no precedent in caselaw for finding that a bank employee is "substantially responsible" for a bank's troubled condition based simply on the employee's "position" or "title". Rather, there needs to be some showing of actual personal wrongdoing. See, Plaintiff's January 9, 2026 MPA in Support of Motion for Summary Judgment, p. 17:9—18:6, n. 11 (hereafter "Pls. Brief").

The Bank's abrupt change of attitude toward Richards in 2020—despite having no "new" information--is readily explained by Wholesale's desire to retaliate against Richards for his whistleblowing. Prior to Richards' retirement in April 2018, he had received nothing but praise from the Bank. The Bank had re-appointed him as its BSA Officer and head of FCRM every year and had given Richards substantial discretionary bonuses and RSR grants each year in recognition of his excellent performance. The Bank also consistently gave Richards excellent performance reviews. Most significantly, prior to Richards' retirement, the Bank had *never* suggested that Richards was in any way at fault or to blame for Wholesale's internal

McGuinn, Hillsman & Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

3

documentation issues. Pls. Brief, pp. 6:25—7:9; 11:3—6.

Yet in 2020, the Bank suddenly decided that it would take away some of Richards' RSR grants and would refuse to write a certification letter on his behalf. <u>There was no information available to the Bank in 2020 that it had not already known during Richards' employment.</u>  The Bank had read ███████████████████████ as they were delivered each year between 2005 and 2018, and the Bank had internal and external auditors who had issued reports every year (and who consistently praised Richards' performance).  The Bank was fully aware of Wholesale's ongoing documentation problems, the 2015 Wholesale Consent Order and all of the actions and efforts by Richards between 2012 and 2017.  Just as Richards had been warned by his boss and ████████████, it was apparent that some persons at the Bank (especially those in Wholesale) were now retaliating against him for his whistleblowing actions.

Even though Richards raised the retaliation issue multiple times in connection with his post-retirement application to the federal regulators, the Board ignored the issue entirely.  The Board made no effort to investigate the potential of retaliation, including failing to interview the persons at the Bank ████████ who had specifically warned Richards of their concern regarding retaliation.  Indeed, the word "retaliation" does not appear a single time in the Board's documents.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████  It was arbitrary, capricious and an abuse of discretion for the Board to shrug off ████████████ and instead give weight to the Bank's after-the-fact "change of mind" which was motivated by hostility toward a whistleblower.  The Board's decision is even more egregious since the result is to effectively cause a forfeiture of Richards' earned wages.

Defendant has also failed to dispel Plaintiff's alternative legal arguments as to why the

4

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

Court should reverse the Board's decision. First, this is simply not a "golden parachute" payment within the meaning of the statute because Plaintiff's RSR vesting was not "contingent" on his termination. Indeed, the RSR Agreement states on its face that the purpose of the RSR vesting is to act as an incentive for Richards to *remain* employed. Plaintiff's retirement did not "trigger" his RSR vesting---Plaintiff's RSRs simply continued to vest uninterrupted, just as they would have if he had remained employed. Second, Defendant does not dispute the very clear legislative history which showed that Congress considered and specifically rejected the broader definition of "golden parachute" which was later adopted by the FDIC in its regulations. Since the Supreme Court's rejection of the *Chevron* doctrine in 2024, courts are no longer required to give any "deference" to regulations which are inconsistent with the underlying statute. Third, with respect to Plaintiff's claim that the Board's actions violated Plaintiff's due process rights, Defendant fails to explain why Plaintiff is not entitled to a genuine opportunity to address and rebut the "secret" evidence and reasons that the Board based its decision on—especially when Richards has no ability at the judicial review stage to augment the Administrative Record.

Even though the APA standard on review is deferential, the Board's decision must be overturned if it is found to be arbitrary, capricious, an abuse of discretion or not in accordance with law, or if it is unsupported by the evidence, or if it is contrary to constitutional right. Pls. Brief, 14:20—15:13. Here, there are numerous grounds for reversing the Board's decision and so allowing Plaintiff to finally receive the compensation that he earned—and was awarded—prior to his retirement.

## II. RICHARDS WAS NOT "SUBSTANTIALLY RESPONSIBLE" FOR WHOLESALE'S INTERNAL DOCUMENTATION PROBLEM

As BSA Officer, Richards' job was to develop BSA programs and guidelines and to then monitor how well the various business units within the Bank were executing them. As the Board admits, Richards did not have the authority or responsibility to carry out the actual "execution" of the programs. Indeed, each business unit (including Wholesale) had its own independent BSA/Risk Management department, with hundreds of employees, and none of them reported to Richards. This meant that Richards had no power to "order" the business units to do anything. Pls. Brief, 7:10—8:10.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

5

At various points in its Brief, Defendant vaguely alludes to the idea that there were "multiple" issues that Plaintiff was to blame for. In fact, there was only *one* issue that the Bank ever used as an excuse for not sending a "certification" letter and/or for depriving Richards of his RSRs following his retirement--the Wholesale Banking Department's customer documentation problem, which led to the 2015 Wholesale Consent Order. See, AR 119—120; 475—476.[1] Similarly, after receiving Richards' application in 2021, the Board focused its investigation entirely on that same single issue. Thus, the question here is whether the Administrative Record supports the Board's finding that Richards was "substantially responsible" for the 2015 Wholesale Consent Order or for any subsequent deficiencies in remediating that Consent Order.

It is clear from the Board's March 2025 Denial Letter and from its Brief that a major factor in the Board's decision was the fact that *the Bank* had said in 2020 that it had reason to believe that Richards was "substantially responsible" for the "troubled condition" of the Bank, i.e., the 2015 Wholesale Consent Order. Defs. Brief, 28:6—20; AR 3817—3820. However, after receiving the Bank's initial letter in May 2020, Plaintiff and his attorneys repeatedly asked the Bank to identify *anything* that that Richards had done (or failed to do) that led to the Bank's conclusion that Richards was "substantially responsible" for the 2015 Wholesale Consent Order. It is undisputed that the Bank was unable to offer any explanation other than the fact that Richards held the titles of BSA Officer and head of FCRM before and after the Consent Order. Pls. Brief, 12:20—13:17. In other words, Richards would "automatically" be deemed at fault for any problems within Wholesale's internal BSA department.

The same theme is repeated over and over again in the Board's writings and in Defendant's Brief. Thus, the Board

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

6

██████████████████████████████████████████████ Def. Brief, 24:12—20; 25:2—5. This is obviously true as a matter of the Bank's corporate structure—all BSA matters fall within the general umbrella of Richards' oversight. But saying that Richards is "ultimately responsible" for all BSA issues as the titular head of BSA is completely different from saying that Richards himself was "substantially responsible" for a particular problem that occurred within Wholesale's *internal* BSA department—a department he had no operational authority or control over. This is especially true when Richards did everything reasonable within the scope of his authority to help Wholesale.

It would be understandable if someone found Richards "substantially responsible" for a particular problem if, as the Bank's BSA Officer, Richards had not realized that the problem within Wholesale existed; or if Richards saw that there was a problem in Wholesale and made no effort to try to help fix it; of if Richards saw Wholesale's problem but failed to report the issue to his superiors. But none of that happened here. Richards completely and properly fulfilled his job duties and responsibilities.

First, for several years leading up to the 2015 Wholesale Consent Order, Richards was well aware that Wholesale's internal BSA department was doing a deficient job addressing its customer due diligence documentation requirements. For that reason, Richards and his FCRM group repeatedly offered suggestions, recommendations and programs to Wholesale's internal BSA department which would have helped address and fix the documentation problem. Pls. Brief, 8:12—25; AR 1—29; 3415--3439.

Second, Wholesale rejected and refused to adopt many of the recommendations and programs that Richards' FCRM group had offered, and this refusal greatly contributed to Wholesale's failure to fix its documentation problem in a timely manner. Pls Brief, 8:18—22; 10:6—8; AR 1—29; 3415--3439.

Third, because of the way the Bank had structured its corporate governance, Richards did not have operational authority or control over Wholesale's internal BSA department or its hundreds of employees and so Richards could not "order" Wholesale to accept his programs or recommendations. Pls Brief, 7:10—8:10; 10:3—5; AR 1—29; 3415--3439.

Fourth, when Wholesale refused to accept Richards' recommendations and programs and

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

7

PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:25-cv-3915-LB

so continued to experience serious problems with its customer documentation, Richards repeatedly raised his concerns with his boss (John Loughlin, the Chief Risk Officer) and with the Bank's Board of Directors, since they were the ones empowered to force Wholesale to take action. It is undisputed that, in the years preceding the 2015 Wholesale Consent Order, Richards sent eight different reports to the Wells Fargo Board of Directors expressing his concerns about the Wholesale documentation deficiencies and Wholesale's refusal to accept his recommendations, and even warning the Board that Wholesale's failures could lead to a Consent Order. Pls Brief, 8:12—25; AR 1—29; 3415—3439.

Fifth, after the 2015 Consent Order, once Wholesale was under an obligation to remediate the problem, Richards' FCRM group carefully monitored Wholesale's progress ███████████ ████████████ and again offered Wholesale programs and suggestions to help with its remediation obligations. In addition, Richards wrote monthly reports and repeatedly alerted his boss and the Board of Directors when Wholesale was giving ███████ and the Board of Directors false, misleading and inaccurate information about Wholesale's supposed "progress". Pls. Brief, 10:15—28; AR 1—29; 3415--3439.

None of these facts are disputed by the Board. What more was Richards supposed to do? The offenses listed in 12 CFR Section 359.4(a)(4) as grounds for denying certification (fraud, embezzlement, falsification of documents, bribery, breach of fiduciary duty, violations of banking laws, etc.) involve serious *affirmative misconduct* by the employee. When Section 359.4(a)(4)(ii) states that another ground for denying certification is when an employee was "substantially responsible for the insolvency of…or troubled condition of the institution", this has to implicate some sort of serious affirmative wrongdoing. Defendant does not dispute Plaintiff's contention that there is no precedent for finding an employee to be "substantially responsible" for the troubled condition of a bank simply by virtue of his "position". To the contrary, before finding an individual "substantially responsible" for the troubled condition of a bank, the courts have always found some element of personal wrongdoing or misconduct, or some personal involvement in establishing harmful policies that directly and significantly contributed to the bank's problems. Pls. Brief, 17:9—18:6, n. 11.

The Board's conclusion that Richards should be deemed "substantially responsible" for

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

8

Wholesale's internal documentation problem also

Significantly, during its investigation into whether to approve or deny Richards' application, the Board also admits that it

AR:3809.

AR:3799—3805; 3809; 3812; 3816.

The notion that Richards can be found "substantially responsible" for Wholesale's internal documentation problems *solely* based on the fact that Richards was the Bank's BSA Officer at the time a Consent Order was issued is arbitrary and capricious.  The standard under 12 CFR Section 359.4(a)(4) is not whether Richards happened to be the BSA Officer at the time a Consent Order was issued---the standard is whether Richards *himself* was "substantially responsible" for the "insolvency or troubled condition" of the Bank and so should be "disqualified" from receiving his earned compensation. Under the APA, if a Board's finding "runs counter to the evidence", then the Board's determination will be deemed arbitrary,

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

9

capricious and an abuse of discretion.  Here, the Board's finding that Richards was "substantially responsible" for Wholesale's internal documentation problem is indefensible and clearly "runs counter to the evidence".

### III.    DEFENDANT'S OTHER ATTEMPTS TO "CRITICIZE" RICHARDS

In its Brief, Defendant fails to answer the point that there is no evidence to support the Bank's baseless speculation (relied on by the Board and cited in the Board's Denial Letter) that Richards may have "undermined" or "undercut" Wholesale's remediation efforts after the 2015 Consent Order.  Defs Brief, 32:14—19; AR:3819.  Richards never "refused" to help Wholesale, nor did he "prevent" Wholesale from carrying out remediation efforts, nor did he in any other way "undermine" its remediation efforts.  The complaints which Wholesale apparently made about Richards ('the relationship between Richards and Wholesale's BSA/AML Group Risk Officer was strained'; 'Wholesale said that it distrusts Richards') were because Richards had carried out his responsibilities as BSA Officer by reporting Wholesale's failures and wrongdoing.  AR:381—82; 485--87; 3810.  None of Wholesale's comments supports the notion that Richards 'hindered' Wholesale from doing its remediation work.  Indeed, as discussed above, ███████████████████████████████████████████████████.

Significantly, the Board also does not dispute that Wholesale's leaders were upset that Richards had repeatedly "blown the whistle" on them and that they therefore labeled Richards a "troublemaker".  AR:9—14; 3423—28.  There is no evidence that *Richards* was at fault for creating "antagonism" with Wholesale leadership and no explanation as to how any such antagonism prevented Wholesale from doing effective remediation work after the Consent Order.  The "antagonism and clashes" referred to by the Board were the result of Richards having objected each time Wholesale attempted to *mislead and/or lie to the Bank's Board of Directors* ██████████████ the remediation progress that Wholesale was supposedly making; or where Richards reported that Wholesale had rejected FCRM's offers of assistance; or where Richards properly informed the BOD that Wholesale was not making adequate progress on the documentation issue; or where Richards informed the Bank ███████████ in February 2018 that Wholesale had engaged in a massive fraud by fabricating phony BOC documents.  AR:9—14; 3423—28.

10

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

Defendant also does not dispute that both Richards' boss (Mr. Loughlin) and ███████ ███████████████████████████████████ expressed concern to Richards shortly before his retirement that he might suffer retaliation from the Bank because of Richards' efforts to rightfully call out Wholesale for its false, misleading and fraudulent conduct.[2]  AR:13—14; 483—84; 3428.

In sum, there is no evidentiary support whatsoever for the Board's assertion that Richards "undermined" Wholesale's remediation efforts.

Defendant also picks out ████████████████████████ ████████████████████████████ ███████████████████████████ █████████████████████████████ ████████████████████████ ██████████████████████████ ███████████████████████ Asking Person X to help a third party *solve* a problem is very different from "blaming" Person X for having created the problem in the first place. Indeed, ███████████████████████████ ███████████████████████████ ████████████ █████████████████████████ ██████████████████████████████ █████████████████████████ The Bank—not Richards—established the governance structure of the Bank and how much authority FCRM had over the Bank's individual business units.  The Board does not dispute that the Bank established a governance structure which gave Wholesale and the Bank's other business units substantial

---

[2]   Not surprisingly, someone in Wholesale stated to an investigator that some persons within Wholesale felt that Richards was "partly responsible" for Wholesale's internal documentation problem.  Def. Brief, 32:10—19. This comment is meaningless since no explanation was offered as to "how" Richards was supposedly to blame—or how he possibly *could* be to blame given the undisputed facts here.

11

McGuinn, Hillsman & Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT        Case No. 3:25-cv-3915-LB

autonomy—including Wholesale having its own internal BSA department with hundreds of employees, none of whom reported to Richards or his FCRM department.  As described previously, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ n.18.  The prior governance structure and reporting lines had been determined by the Bank, not by Richards.[3]

## IV.   **RETALIATION**

As part of his application process, Plaintiff raised a critical issue which the Board completely ignored during its evaluation of Plaintiff's application:  that the Bank took a series of negative actions against Richards after his retirement because the some individuals within the Bank were retaliating against Richards due to his history of whistleblowing.

Prior to Richards' retirement in April 2018, neither the Bank nor the Bank's internal or external auditors had *ever* suggested that Richards was to blame for Wholesale's internal documentation problems relating to the 2015 Wholesale Consent Order, nor that he was to blame for Wholesale's slow remediation progress.  AR:5; 9—14.  In fact, prior to Richards' retirement, both the Bank and the Bank's auditors had lavishly praised Plaintiff' job performance.  Pls. Brief, 6:25—7:9.  Each year between 2005 and 2017, the Bank received and read ████████████████████████████████████████████ ███████████.  The Bank was well aware of Wholesale's multi-year documentation problem; was well aware of the OCC's 2015 Wholesale Consent Order and other MRAs concerning Wholesale's documentation issue; and was fully aware of Richards' actions and efforts and role with respect to Wholesale.  Yet every year between 2005 and 2018, the Bank re-appointed Richards as BSA Officer and head of FCRM; approved the BSA programs that Richards had

---

[3]  At one point, Defendant suggests that Richards must have had some authority over Wholesale's BSA Department because FCRM had some employees "embedded" in the business units. Defs. Brief, 32:27—33:11.  This simply meant that Richards had some "insight" into what was happening within Wholesale.  He still had no authority over Wholesale's BSA/Risk Management Department since none of its managers or employees actually reported to Richards or FCRM.

12

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

prepared; awarded Richards significant bonuses and RSR grants; awarded Richards salary increases; and gave Richards excellent performance reviews.[4] Pls. Brief, 6:25—7:9. <u>Not one time prior to Richards' retirement in 2018 did the Bank or the Bank's auditors ever suggest that Richards was in any way to blame for Wholesale's documentation problem or for the 2015 Consent Order or for Wholesale's failure to then make adequate remediation progress.</u>

Two years *after* Richards' retirement, the Bank suddenly claimed that Richards had been "substantially responsible" for Wholesale's deficiencies in 2015 and that the Bank would now refuse to send a certification letter to the FDIC and would take away some of his RSRs. <u>The Bank did not learn any "new" information about Richards between 2018 and 2020.</u> It is completely disingenuous—and highly suspicious--for the Bank to say that, based on a 2020 review of ██████████████████████████, it had now decided that Richards was "at fault" for Wholesale's documentation problems and that it would penalize Richards—even though the ███████████████████████████████████████████ Def. Brief, 11:5—19; 29:8—19 (stating that its decision was based on a review of ███████████████ ████████████.[5]

In fact, as Richards laid out in his application process, it seemed evident that certain persons within the Bank (especially from Wholesale) were retaliating against Richards due to his history of whistleblowing. It is undisputed that Wholesale had significant antagonism towards Richards due to his whistleblowing and that Wholesale had called Richards a "troublemaker" multiple times. Wholesale was upset with Richards for numerous reasons: because Richards

[4] After combing through 12 years of performance reviews, the only 'negative' comment the Board could cite was a statement in 2017 where Richard's boss told Richards that, in 2017, he "would like to see Jim get more involved in the solution of the problem rather than simply reporting and monitoring". Def. Brief, 32:24--26; AR: 136. This is hardly a damning criticism of Richards, whose primary job was to monitor the business units and report on their progress or shortcomings. In fact, this is very similar ████████████████████████████████████ ██████████████████████████████████████████████████████████ In neither case was anyone suggesting that Richards had "caused" Wholesale's problem or that he had failed to provide Wholesale with assistance.

[5] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ as of March 2016, Richards had sent <u>eight</u> reports to the Bank's Board regarding his concerns about Wholesale's documentation problem.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

13

PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:25-cv-3915-LB

repeatedly told his boss and the Bank's Board of Directors ("BOD") about Wholesale giving false and misleading reports regarding Wholesale's remediation efforts; because Richards had repeatedly warned the BOD about Wholesale's internal documentation deficiencies in the years leading up to the Wholesale Consent Order; and because Richards had informed the BOD about Wholesale's refusal to accept programs and assistance that FCRM had offered.  Pls. Brief, 33:1—34:4; AR:9—14; 3423—3428.

Most significantly, Wholesale and certain others at the Bank were very upset with Richards in early 2018 because Richards learned that Wholesale had been involved in a massive fraud in which Wholesale was fabricating phony Beneficial Ownership Certificates ("BOCs"). AR:13—14; 3428.   Richards immediately contacted the Bank's senior management and insisted that the Bank promptly report Wholesale's fraud ▮▮▮▮—which Richards did. *Id.*  Both Richards's boss (Mike Loughlin, the Chief Risk Officer) ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ told Richards shortly before he retired that certain persons at the Bank were upset with Richards' whistleblowing, and they were concerned that he might be retaliated against by the Bank.  Pls. Brief, 11:16—26; 33:13—21; AR:13—14; 483—84; 3428.  Defendant does not dispute any of this.

In its Cross-Motion/Opposition, Defendant also does not dispute that the Board never investigated the issue of potential retaliation.  The Board never interviewed Mr. Loughlin ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ even though both of those persons expressed concern to Richards shortly before his retirement that he might be retaliated against by the Bank because of his whistleblowing.  Incredibly, the word "retaliation"—or even the concept of possible retaliation—never appear anywhere in the Board's file. The Board simply ignored the issue of retaliation and acted as if Richards had never raised it.

In its Brief, Defendant tries to downplay this glaring omission by citing to *one* comment made by the Board's Legal Division: that someone reviewed the information considered by the Bank in withholding certification, and the information did not indicate that the Bank withheld certification in bad faith.  Def. Brief, 31:1—4. This one comment does not remedy the serious problem that the Board never investigated the issue of potential retaliation but instead simply chose to ignore it.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

14

Defendant states that Richards' support for his claim of retaliation "consists entirely of his own letters to the Board and Wells Fargo". Def. Brief, 30:12—18. In fact, both Richards' boss (the Chief Risk Officer) and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ told Richards that they were concerned about possible retaliation against him by the Bank. Thus, the possibility of retaliation was not something Richards was simply imagining in his own head. It is also baffling why the Board would not consider Richards' letters to be sufficient to cause the Board to investigate possible retaliation when Richards' letters had described the retaliation warnings by Loughlin and Smith; had pointed out that Wholesale had repeatedly called him a "troublemaker" due to his whistleblowing (AR 12-13; 3428); and had explained the reason for Wholesale's clear antagonism toward Richards, which Richards specifically pointed out was a likely basis for the Bank's denial of his certification. Pls. Brief, 33:22-27.

One of the bases for finding that an agency determination is arbitrary, capricious and an abuse of discretion is that the agency, "entirely failed to consider an important aspect of the problem". Pls. Brief, 34:5—10. Here, the Board failed to investigate or consider a critical reason raised by Richards as to why the Bank took away two of his RSR awards and refused to write a certification letter in 2020 despite having no 'new' information. This constitutes yet another reason that the Board's decision should be overturned.

## V.    PLAINTIFF'S DEFERRED COMPENSATION WAS NOT A "GOLDEN PARACHUTE" PAYMENT

The Board stated that Richards' RSR awards met the definition of a "golden parachute payment" because payment of the RSRs was "*contingent on, or by its terms payable on or after*" Richards' termination of employment (quoting 12 CFR 359.4(a)(1)). The Board's determination was not in accordance with the law and, as a result, the Bank was *not* required to obtain "permission" from the Board before it could pay Richards his deferred compensation.

A.  Richards' RSRs Were Not "Contingent on the Termination of His Employment"

In 12 U.S.C. Section 1828(k)(4), Congress defined a "golden parachute payment" as "any payment…in the nature of compensation…that (i) **is contingent on the termination of such party's affiliation with the institution**…and (ii) is received on or after the date on which… the…institution is in a troubled condition".

15

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

Congress's purpose for enacting the "golden parachute" restrictions of 12 USC Section 1828 was to ensure that executives who had engaged in misconduct and were significantly involved in creating a bank's troubled financial condition were not making agreements with the bank to receive special 'windfall' payments if their employment was terminated.[6]  See, Pls. Brief, 16:14—18:6.  This was consistent with the historical meaning of a "golden parachute" payment, i.e., a special large payment that would be provided to an executive *only if* the employee is terminated in the future under certain circumstances.  *Id.*  Such a payment is not part of the employee's normal compensation and was not earned by the employee for any services he or she had actually rendered.  Instead, it was a special post-employment payment made *in addition to* an employee's previously earned compensation.

Richards' RSRs were not a "windfall", nor were they some form of severance pay.  They were a basic part of Richards' annual compensation, and were awarded by the Bank based entirely upon the quality of Richards' job performance in the <u>prior year</u>.  The RSRs were thus deferred compensation that had been <u>earned</u> by Richards based on services he had already provided.  Pls. Brief, 18:7—19:18; AR:208—12; 217—21. The Board's denial of Richards' application is thus effectively causing a forfeiture of Richards' earned wages.

More significantly, Richards' receipt of his deferred compensation—the RSRs at issue here—was **<u>not</u>** contingent on his termination.  To the contrary, Richards' RSRs vested *so long as he remained employed by Wells Fargo* and they generally *ceased* vesting upon termination. Pls. Brief, 18:7—19:18; AR:190, 199. The RSR Agreement explicitly states that the purpose of the RSRs is to incentive Richards to remain employed.  *Id.*  They were designed to serve as "golden handcuffs", not a "golden parachute".   This is the *opposite* of a payment that is "contingent on termination".  The fact that the RSR Agreements provided that Richards was entitled to <u>continue</u> vesting in his RSRs if he "voluntarily retired" from the Bank does not transform his deferred compensation into something that is "contingent" on his termination.  Richards' RSR compensation was not "triggered" by his retirement nor was it was it some sort

---

[6] See also, *BBX Capital v. FDIC,* 956 F.3d 1304, 1318 (11th Cir. 2020) ("Congress' primary focus, in enacting the golden parachute provision, was to prevent executives from 'voting themselves generous bonuses at the expense of the institution or company.'" (quoting the Congressional Record for the bill in 1990)).

16

McGuinn, Hillsman & Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

of "new" compensation being awarded to him as a result of his retirement.  Richards had already been awarded his RSRs long before his retirement, and he simply continued to vest in these RSRs following his retirement.

In its Brief, Defendant tries to contort the plain meaning of "contingent on termination".  But Richards' entitlement to his continued RSR vesting was not "dependent" on his termination.  To the contrary, once Richards had been granted his RSRs in any particular year, he was entitled to continue vesting in those RSRs unless he was terminated for cause, or unless he simply quit his job and went to work elsewhere.  Retirement had no impact at all on his RSR awards-- Richards' already existing right to vesting continued without interruption.

Defendant cites *Rohr v. Reliance Bank*, 826 F.3d 1046 (8th Cir. 2016) in support of its argument that Richards' entitlement to continued vesting upon retirement should be deemed compensation that is "contingent on termination".  In *Rohr,* the plaintiff was terminated prior to the expiration of his expected employment term and so sued the bank for damages—the final year of salary that he would have been paid under his contract if he had not been terminated. The FDIC believed that the "damages" plaintiff sought fell within the ambit of a 'golden parachute' payment because they were actually caused by his termination, i.e., the plaintiff was really suing for the lost wages which resulted from his termination, and so this constituted compensation that was "contingent" on his termination.  The FDIC found that the compensation had not been earned by the plaintiff since he had not yet rendered the services required to earn the money, and so this money was more accurately characterized as compensation that was dependent on his termination. The 8th Circuit upheld the FDIC's finding as not being arbitrary or capricious. This is not analogous to Richards' situation, where the RSRs are compensation that Richards had already earned and been awarded for services he had rendered in the prior year.

Defendant also cites two district court cases:  *Larison v. Ameris Bank,* 2022 U.S. Dist. Lexis 128751 (M.D.Fla. 2022) and *Knyal v. OCC*, 2003 US Dist. Lexis 28513 (N.D.Cal. 2003).  Both courts did suggest that a payment could be a "golden parachute" even if there was more than one way for the employee to receive the compensation (with or without a termination), but these district court decisions are obviously not binding on this Court.

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

17

B. <u>The Federal Regulations Unlawfully Expanded the Statutory Definition of a "Golden Parachute" Payment.</u>

As explained in Plaintiff's original Brief, the regulations defined a 'golden parachute' payment ("*payable on or after the termination of his employment*") in a way that <u>grossly expanded</u> Congress' statutory definition. 12 CFR359.4(a)(1). Pls. Brief, 19:23—22:19. Under the APA, the Board's action was "not in accordance with law" because the regulation at issue is invalid since it unlawfully changed the statutory definition in a manner which improperly altered and amended the statute.

Defendant has no answer to Plaintiff's description of the statute's detailed legislative history, which shows that Congress considered two versions of the bill—one with the more restrictive definition of "golden parachute" ("contingent on termination") and one with the "expanded" version ("contingent on termination" <u>or</u> "payable on or after termination"). Congress specifically considered and rejected the more expansive definition. Pls. Brief, 20:4—21:6. An agency does not have the power or discretion to promulgate regulations that are inconsistent with the governing statute, or which alter or amend the statute, or which enlarge its scope. A federal regulation that does so is invalid. See, Pls. Brief, 21:2—18. Defendant's only response is to cite a general platitude that sometimes legislative history is more confusing than clarifying. That is hardly an answer where, as here, the legislative history is very clear and there is no "confusion": Congress was offered two versions of the definition for "golden parachute payment" and rejected the one that was broader.

Defendant also cites several cases for the proposition that it was permissible for the FDIC to create a regulation which expanded the statutory definition of a "golden parachute payment". However, those cases were decided prior to *Loper Bright v. Raimondo*, 603 U.S. 158, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024), in which the Supreme Court rejected the "*Chevron*" doctrine which had required courts to give deference to agency regulations if there was any ambiguity regarding whether they conflicted with a statute. Pls. Brief, 22:1—13. Indeed, both *Knyal* and *Larison* specifically relied on the *Chevron* doctrine when evaluating whether the expanded statutory definition in 12 CFR 359.4 was appropriate.[7]

---

[7] The other two cases cited by Defendant are irrelevant. In *Rohr v. Reliance Bank*, 2014

18

McGuinn, Hillsman & Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

Defendant also argues that, without the regulation's expanded scope, banks could hypothetically create a "loophole" permitting employees to receive large windfall payments by simply providing that an employee would receive an annual payment for the rest of his life, and so payment would not be "contingent" on termination.  That hypothetical has nothing to do with what happened to Richards.  His RSR payments were not "loopholes"; they were not designed to "evade" a termination condition; and they were not a "windfall".  The RSRs were simply a standard part of Richards' annual compensation.  They were awarded under the same terms and conditions each year in recognition of his prior year's performance and no further RSRs could be granted once Richards' employment ceased.

C.    Richards Clearly Has "Standing"

Defendant also claims that Plaintiff does not have "standing" to seek relief from the Court because the FDIC is not a party to this lawsuit and therefore Plaintiff fails to meet the "second and third elements" required to establish standing.  Def's Brief, pp. 19--20.  This is meritless since Plaintiff clearly meets the test for both elements.

As to the second element ("the injury was caused by the defendant"), the injury suffered by Richards was the Board's denial of his application and so the deprivation of his RSR compensation.  This injury was indisputably caused by the Board, not by the FDIC.  It does not matter "why" the Board denied Richards' application—the Board is the entity that denied his application and so directly caused Plaintiff's injury.

As to the third element, "that the injury likely would be redressed by the requested judicial relief", once again Plaintiff obviously meets this element.  Plaintiff has asked the Court to reverse the Board's denial of his application for his RSR compensation on a variety of grounds, including that the Board's decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" and was "contrary to constitutional right".  Under the APA, the Court can obviously grant such relief and so award Plaintiff his RSR compensation.

---

U.S. Dist. Lexis 68904 (E.D.Mo. 2014), the plaintiff was not challenging the validity of the regulation that defined "golden parachute" and so the Court never considered the issue. *Bauer v. FDIC*, 38 F.4th 1114 (D.C.Cir. 2022) involved the plaintiff challenging a completely different FDIC regulation (12 CFR 303.244(c)) which had to do with what information needed to be included in the employee's application for a golden parachute payment.

19

McGuinn, Hillsman & Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

There is no need for the FDIC to be a party to this lawsuit in order for this Court to grant Plaintiff's requested relief.

The two cases cited by Defendant in support of its "standing" argument are completely off point. In *Fulani v. Brady*, 935 F.2d 1324 (D.C. Cir. 1991), the plaintiff's "injury" was her exclusion from the Presidential candidate debates. But instead of suing the Commission on Presidential Debates (the entity that had made the decision to exclude her), the plaintiff sued the IRS on the ground that it had given tax exempt status to the Commission. The Court logically said that the IRS had caused no "injury" to the plaintiff--directly or indirectly—and so she had no standing to sue the IRS.

In *Guardians v. US Forest Service*, 70 F.4th 1212 (9th Cir. 2023), the Court found no standing for similar reasons—a lack of any clear connection between the defendant and the claimed injury. The plaintiff was suing the United States Forest Service over its livestock grazing policies. But the claimed "injury" was the potential that wolves might get hunted under Washington state law. The Court held that, even if it disapproved of the Forest Service grazing policies, this would have no impact on Washington's state law concerning wolf hunting. Therefore, the Court found that it was erroneous for the plaintiff to sue the Forest Service when its grazing policies had no legal or traceable connection to the real "injury" at issue: the state's permission to hunt wolves.

Because the FDIC's regulation at 12 CFR Section 359.4(a)(1) defining "golden parachute payment" improperly altered and expanded the statutory definition, that regulation is invalid. Since the Board used that regulation as a basis for denying Richards his compensation, the Board failed to act in accordance with law and made a determination that was arbitrary, capricious and an abuse of discretion.

## VI.    DISCRETIONARY FACTORS

Although the Board's central and overriding reason for denying Richards his RSR compensation was its conclusion that he was "substantially responsible" for the Bank's "troubled condition", the Board also claimed that several other "discretionary" factors supported its decision.

First, the Board noted that Richards was a senior officer "in a position of managerial and

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

20

fiduciary responsibility" and so "shared responsibility" for criticisms about Wholesale's internal BSA/AML program. AR:3819. This is the same faulty logic used by the Board to conclude that Richards was "substantially responsible" for the Wholesale Consent Order, i.e., simply because Richards held the titles of BSA Officer and head of FCRM he is "automatically" to blame for any internal problems within Wholesale. As discussed above, this is completely baseless. Richards did everything reasonable within the scope of his authority to address Wholesale's problems and he was not "responsible" for those problems.

The Board also states that the Bank's decision not to provide a certification letter also carries "great weight", since this presumably meant that the Bank believed Richards was "substantially responsible". AR:3819. Once again, there is no evidentiary basis to support the notion that Richards did anything "wrong" or that he was "substantially responsible" for Wholesale's documentation problem. In fact, Richards was the *whistleblower* here. As discussed above, when Richards and his attorneys asked the Bank to identify *anything* that Richards had done (or failed to do) that justified the Bank's refusal to send a certification letter, the Bank was unable to do so---other than repeat the fact that Richards was the Bank's BSA Officer during this time period. AR:14—15; 3416—17.

With respect to the "second" discretionary factor (the length of Richards' tenure and the size of the requested compensation), Richards served at the Bank for over 12 years, and his two RSR awards had a value of $456,378, i.e., just a little more than one year of Richards' salary. AR:120; 169; 3810. The Board denied Richards his RSR awards *in their entirety*, partly because the FDIC "guidelines" generally disapprove of granting an employee a payment that exceeds one year of salary. Even apart from the fact that these are just "guidelines", the same guidelines also permit the Board to award part of a requested payment. In fact, there are numerous cases in which the Board has approved payments for less than the full amount requested by the plaintiff. Pls. Brief, 32:1, n.23. Thus, the Board could have easily chosen to grant Plaintiff one year's worth of RSRs, or 75% of his RSRs, and still been below the "one year salary" threshold.

Furthermore, the irony of the Board saying that Richards was already "well compensated" by the Bank due to his annual bonuses and RSR grants is that it simply proves that the Bank thought Richards had done an outstanding job as BSA Officer and that the Bank never believed

McGuinn, Hillsman & Palefsky 220 Jackson St., Ste. 350 San Francisco, CA 94111 (415) 421-9292

21

during Richards' employment that he had been "at fault" for Wholesale's internal problems.

As part of the "second" discretionary factor, the Board also stated that "*During this period… the Company paid a civil money penalty of $67.8 million for sanctions violations, which was an area of your responsibility.*"  AR:3808; 3819; 3793--3797.  The Board's use of this as a "factor" is outrageous and is not satisfactorily addressed in Defendant's Brief.  The penalty was assessed in 2023 and was apparently related to conduct by the Bank between 2010 and 2015.  The Bank was fully aware of the issue in 2015, since it "self-reported" the problem in 2015.  AR: 3793—3797.  <u>There is no evidence in the Administrative Record that the Bank ever "blamed" Richards for whatever issue led to this penalty or that Richards was in any way at fault for whatever issue led to this penalty</u>.  Once again, Defendant simply makes a passing comment that the penalty related to some type of OFAC violation, and since Richards was the head of FCRM during this period, it is somehow OK to blame him. Def. Brief, 35:5—6.  There is not a single piece of evidence or explanation in the Administrative Record as to how *Richards* was at fault or whether he even had any involvement in whatever issue it was that led to the penalty.

Furthermore, this penalty occurred in 2023—five years *after* Richards had retired and long after he had submitted his application in 2021.  Richards had no idea that the Board might consider using this as a factor in denying him compensation he had earned in 2017 and 2018.  Therefore, Richards had no opportunity to ever be heard about the Board's baseless claim that he should be held "responsible" for this penalty or that this penalty would be used as a factor.  If Richards *had* been given an opportunity to respond to this issue, he would have been able to clearly explain that he was in no way responsible or at fault for the subject of this penalty.  Since the Administrative Record is closed, Richards now has no way to defend himself against this "secret" factor used by the Board.

Not only does the Board's action violate Richards' constitutional due process rights, but an agency's action will be deemed arbitrary and capricious under the APA where the agency has offered an explanation for its decision that "runs counter to the evidence".  Here, the Board has offered <u>no evidence</u> to explain how Richards was "responsible" for this $67 million penalty.

As to the "third" discretionary factor, the Board admits that Wells Fargo has significant assets and that paying Richards his RSR compensation would have no impact on the Bank's

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

22

financial condition.  AR:3804; 3815; 3819.  Yet instead of using this as a factor in favor of paying Richards, the Board said that the regulations did not favor paying senior managers who were "responsible for a bank's poor condition" and that Richards "shared responsibility" for Wholesale's BSA program. AR: 3819.   As discussed above, the assertion that Richards was "responsible" or "to blame" for Wholesale's internal documentation problem is completely unsupported by the Administrative Record and is contrary to ██████████████ .

## VII.  **THE BOARD VIOLATED RICHARDS' DUE PROCESS RIGHTS**

The fundamental requirement of due process is the opportunity to be heard, present evidence and defend oneself before the government can deprive an individual of his or her property.  Pls. Brief, 35:16--25. The Board's March 2025 decision to deprive Richards of his property was done without providing Richards any such fair process or procedures.  Richards was required to submit an application for his RSR compensation in 2021 but had no ability thereafter to know what "evidence" the Bank had presented to the Board, nor what facts the Board was considering before making its decision.  The Board reached its decision in secret, without offering Richards the opportunity to see the evidence that the Board had received from the Bank and without offering Richards the opportunity to be heard by the Board or to respond to the evidence that the Board was considering before the Board issued its decision.

As expected, the Board has argued that Richards has an "opportunity to be heard" because he has the right under the APA to file for "judicial review" of the Board's decision.  But the Court's review is limited to the *existing Administrative Record*, and so Richards will never have an opportunity to provide evidence in response to whatever "evidence" the Bank gave the Board or whatever investigation the Board conducted or all the factors the Board was considering.   For example, Richards had no opportunity to rebut the patently false assertion that he "undermined" Wholesale's remediation efforts, nor to address the 2023 "$67 million penalty" issue.

Plaintiff's attorney had some brief communications with Defendant's counsel before the final decision regarding some of the factors that the Board was considering, and Defendant notes that Plaintiff was able to submit a "supplemental" letter in 2024.  AR:3390—3468. Notwithstanding some of these "informal" discussions, Plaintiff still had no idea in 2024 what the Bank had told the Board, and certainly had no idea that the Board intended to base its denial

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

23

in part on the patently false assertion that Plaintiff had "undermined" Wholesale's remediation efforts after 2015.  Nor did Plaintiff have any idea that the Board intended to use as a factor a 2023 civil penalty that had nothing to do with the Wholesale Consent Order and which concerned an issue for which Plaintiff was completely blameless.

In *Mathews v. Eldridge*, 424 U.S. 319 (1976) the Supreme Court stated that three factors should be considered when reviewing the constitutional sufficiency of administrative procedures.  All three factors weigh in favor of Richard being provided some opportunity to respond to the Board's "evidence" before the Board makes its final determination.  Pls. Brief, 36:1—37:16.  It would certainly place no burden upon the Board to send Richards a tentative decision with a full statement of the Board's reasons and all of the evidence it was relying upon, and then allow Richards the opportunity to respond in writing and present additional evidence to the Board in support of his position and to correct factual errors or mistaken assumptions by the Board, before the Board denied Richards his property.

Defendant cites *Doolin v. FDIC*, 53 F.3d 1395 (4th Cir. 1995), but that case actually supports Plaintiff's position.  In *Doolin*, the FDIC was deciding whether to terminate a bank's insurance. In such cases, the APA required that there be discovery and a "formal hearing" before the FDIC took such action. Indeed, in *Doolin* the Court noted that due process was satisfied precisely because the FDIC was required to give notice to the bank of its intended action (terminating the bank's insurance), and the FDIC was also required to provide the bank with detailed underlying data justifying a termination as part of its notification.  The bank then had the opportunity to respond to the notice and data, allowing it to challenge the intended re-classification *before* the FDIC made its actual decision.  *Doolin* thus supports exactly the argument that Plaintiff is making here:  due process requires that the Board give Richards notice of its intended action and the specific underlying reasons for it, so that Richards can adequately respond and let the Board consider his response and evidence *before* making a final decision on his application.[8]

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

---

[8] In *Doolin*, the Court was able to decide the matter on summary judgment, without a formal hearing, because the undisputed facts showed that the bank had never paid the required insurance premium and so cancellation of its insurance was automatically justified as a matter of law.

24

PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:25-cv-3915-LB

Defendant also cites *Donatoni v. Dept of Homeland Security*, 184 F.Supp. 3d 285 (E.D.Va. 2016), but that case simply says that, under the APA, a criminal defendant who is asserting Fourth Amendment violations is allowed to raise his underlying constitutional claims as part of the judicial review phase of the case.  That has nothing to do with the underlying issue in our case, which is whether the Board's procedure for deciding Richards' right to compensation violates due process.

**VIII.    <u>CONCLUSION</u>**

The Board's decision to deny Richards his deferred compensation should be reversed, since that decision was arbitrary, capricious, an abuse of discretion, unsupported by the evidence, not in accordance with law, and a violation of Richards' constitutional rights.

Dated: April 3, 2026                                McGUINN, HILLSMAN & PALEFSKY

By:    */s/ Keith Ehrman*
           Keith Ehrman
           Cliff Palefsky
           Attorneys for Plaintiff

McGuinn, Hillsman
& Palefsky
220 Jackson St., Ste. 350
San Francisco, CA 94111
(415) 421-9292

25

PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                Case No. 3:25-cv-3915-LB